## TUUK v. ANDERSEN

1. TRIAL—ISSUE—FAILURE TO PLEAD—EVIDENCE—WAIVER.

Failure of plaintiff to plead an issue is waived by failure of defendant to object to testimony bearing on that issue, particularly where the defendant is aware of the nature of plaintiff's claim and thus of the nature of the issue, and defendant's testimony joins the issue by denying plaintiff's claim.

2. CONTRACTS—OFFER—REJECTION—WRITING.

A rejection of a written offer need not be in writing.

3. CONTRACTS — OFFER — REJECTION — PAROL EVIDENCE — STATUTE OF FRAUDS.

Parol evidence is admissible to prove that payments in certain amounts did not constitute an acceptance of the terms of a contract offered by letters which called for payments in those amounts, but were rather made under separate oral agreements, because the parol is not being used to vary the terms of a written agreement or to modify the terms of a contract required to be in writing, but rather to prove that the writing never became a contract.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 41 Am Jur, Pleading § 393.
[2] 17 Am Jur 2d, Contracts § 39.
[3] 17 Am Jur 2d, Contracts § 77.
[4] 49 Am Jur, Statute of Frauds § 189 et seq.
[5] 17 Am Jur 2d, Contracts § 355.
[6] 5 Am Jur 2d, Appeal and Error § 939 et seq.
[7] 18 Am Jur 2d, Conversion § 9 et seq.
[8] 32 Am Jur, Landlord and Tenant § 325 et seq.
[9] 32 Am Jur, Landlord and Tenant § 299 et seq.
[10] 42 Am Jur 2d, Injunctions § 292.
[11] 32 Am Jur 2d, Landlord and Tenant § 953 et seq.
[12] 18 Am Jur 2d, Conversion § 82 et seq.
[13] 58 Am Jur, Witnesses § 609 et seq.

(1)

4. FRAUDS, STATUTE OF—LEASE—ORAL ARGUMENT.

Allowing proof by a lessee of an oral agreement on the amount of rent payable during a holdover tenancy after the expiration of both the original term under a written lease and the holdover term does not violate the provision of the statute of frauds requiring a lease for more than a year to be in writing where neither lessor nor lessee claims that the original written lease controls and the lessor relies on a writing not signed by the lessee to establish a greater amount of rent (MCLA § 566.108).

5. CONTRACTS—LEASE—TERMS—INCREASED RENT.

Submission to jury of question whether lessee had paid increased rent to lessor according to terms contained in letters sent by lessor to lessee, the increases being because of improvements to land made by lessor, or whether the increases were paid by lessee subject to an "audit agreement" with a possible refund as claimed by lessee, was error where the lessee's claim about the audit agreement was amorphous and provided no standard by which the jury could determine an appropriate rent for the improvements.

6. APPEAL AND ERROR—REMITTITUR.

The Court of Appeals has the power to reduce the amount of a jury verdict by *remittitur* where the excessive amount in the verdict can be segregated.

7. CONVERSION—INTANGIBLE PROPERTY.

Intangible personal property can be the subject of conversion.

8. CONTRACTS—ASSIGNMENT—PROHIBITION—THIRD PARTIES.

Contract of lease between manufacturer of bowling pinsetter machinery and corporate lessee which prohibited assignment of lessee's interest may have permitted manufacturer to refuse to recognize rights of a third person who acquired the lessee's rights by agreement with it, but it did not prevent proof by parol evidence of the agreement between the lessee and the third person.

9. CONTRACTS—LEASE—PERSONAL PROPERTY—OPTION TO PURCHASE—CONVERSION.

Option to purchase bowling pinsetter machinery, offered by manufacturer-lessor of the machinery to a corporate lessee, was an adjunct of the lease contract even though not a right of lessee in the original lease, and purchase of the machinery and termination of the lease by the corporate lessee was a conversion of the rights of a third party who had made

an oral agreement with the corporate lessee by which he acquired all rights in the lease, and had paid rents under the lease and all expenses for the use, maintenance and ownership of the pinsetter machinery.

10. CONVERSION—EVIDENCE—INJUNCTION—DOMINION.

Permitting the jury to consider an injunction, issued against plaintiff at the instance of defendant prohibiting the plaintiff from removing disputed personal property from defendant's building after termination of a lease, as evidence of conversion of plaintiff's property by defendant was proper where there was also evidence that defendant used the injunction not merely to preserve the *status quo* of the property until the dispute could be settled, but to assume dominion over the property.

11. CONTRACTS — LEASE — EXTENSION — FIRST REFUSAL — BREACH — STATUTE OF LIMITATIONS.

Ruling of trial court that claim for damages for breach of "right of first refusal" in written lease should not be submitted to the jury was correct where a subsequent agreement, partly written and partly oral, either was negotiated pursuant to the right of first refusal or was a breach of that right, that occurred more than six years before action was brought.

12. CONVERSION—DAMAGES—LOSS OF PROFITS—PROOFS.

Refusal of trial court to submit to the jury the issue of damages for loss of profits of plaintiff's bowling-ball business by reason of defendant's conversion of his personal property used in that business on premises leased from defendant and the consequent cancellation of plaintiff's franchise by bowling-ball manufacturer was proper where plaintiff did not prove that he could not purchase like equipment to conduct the business nor did he prove that he could have transferred the patronage of his customers to some new location.

13. WITNESSES—CROSS-EXAMINATION—PREVIOUS RELATIONSHIP.

Permitting cross-examination of defendant about his business relationship with plaintiff for many years before the transactions which gave rise to the action was not error where the course of dealings of the parties would bear on the likelihood of the oral agreements alleged by plaintiff having been made and where the questions tested the defendant's credibility.

Appeal from Saginaw, Hazen R. Armstrong, J. Submitted Division 3 February 10, 1969, at Grand

Rapids. (Docket Nos. 4,397, 4,398.) Decided December 10, 1969. Rehearing denied March 30, 1970. Leave to appeal denied June 17, 1970. 383 Mich 792.

Complaint by Henry A. Tuuk against Frank N. Andersen and Saginaw Recreation Company, a Michigan corporation, for return of rent overpayments and for conversion of personal property. Judgment for plaintiff. Defendants appeal. Affirmed in part and remanded for modification of the judgment.

*van Benschoten & van Benschoten,* for plaintiff.

*Braun, Kendrick, Finkbeiner, Schafer & Murphy* (*Edward J. McArdle,* of counsel), for defendants.

Before: LEVIN, P. J., and HOLBROOK and DANHOF, JJ.

LEVIN, P. J. The plaintiff, Henry Tuuk, is a former tenant of the defendant corporation, Saginaw Recreation Company. The defendant, Frank Andersen, is the president and sole stockholder of the corporation. The defendants appeal a jury verdict of $401,680.

There are a number of issues, but a common question, central to most of them, is whether the relationship of the parties is governed by the conversations upon which Tuuk relies or the writings upon which the defendants rely.

Tuuk, as tenant, and the corporation, as landlord, entered into a five-year written lease of a bowling alley on June 1, 1951. After the expiration of the term of the lease on May 31, 1956, Tuuk remained on as a tenant until July 30, 1962, when he vacated the premises following the termination of his ten-

ancy by the corporation and the issuance of a writ of restitution in summary proceedings for possession commenced by the corporation.

Tuuk's complaint seeks the return of money he paid the corporation during the six-year holdover tenancy, and damages for the conversion of personal property which he asserts the corporation wrongfully insisted on keeping for itself upon termination of the tenancy.

Tuuk's claim, as it was presented to the jury, was for $410,855, consisting of three items:

(1) money allegedly overpaid, $53,105 ($37,855 as the amount overpaid plus interest of $15,250);

(2) conversion of automatic pinsetter lease, $217,750 (value $174,200 plus interest of $43,550); and

(3) conversion of fixtures and equipment, $140,000 (value $112,000 plus interest of $28,000).

## I.

### *Rent payable by Tuuk during holdover*
### *tenancy; money allegedly overpaid*
### *by Tuuk*

During the six-year holdover tenancy, Andersen, for the corporation, wrote Tuuk three letters increasing the rent.

(a) The first letter, dated September 14, 1956, stated that the rent would be increased from $40,500 to $51,300 a year for 5 years—an increase of $10,800 a year.

Shortly after the term of the lease expired on May 31, 1956, automatic pinsetters were installed in the bowling alley. The letter stated that the increase in rent reflected a five-year amortization of the sum of the amount expended by the corporation for installation of automatic pinsetters ($31,314.73)

and the amount of an old note owing by Tuuk ($13,472.73), and 6% interest on that sum for five years, and a provision for anticipated increase in property taxes.

· (b) The second letter, dated November 17, 1959, was sent after the corporation had constructed a parking lot for use in conjunction with the bowling alley. The letter stated that the parking lot cost $95,000, including the cost of the land, and that the rent would be increased to $61,875 a year beginning December 1, 1959—an increase of $10,575 a year.

(c) The third letter, dated March 9, 1961, was sent after $14,790.29 of carpeting was installed in the bowling alley. This letter provided for a rent of $64,755 a year "starting January 1, 1961, with new lease * * * for 5 years"—an increase of $2,880 a year. A proposed lease was enclosed with the letter but was never signed by Tuuk.

Tuuk paid the increased amounts demanded by the corporation except for some installments which became due in the spring of 1962 at about the time his tenancy was terminated. He testified, however, that after he received the first letter (dated September 14, 1956) he communicated with Andersen and it was agreed that Tuuk would pay the increased rent provisionally subject to an audit.

It was Tuuk's claim that he and Andersen agreed that the corporation's expenditures for installation of the pinsetters ($31,314.73) would be treated as a loan by the corporation to Tuuk and that the sum of such expenditures together with the old indebtness of $13,472.73 would, indeed, be paid in the manner stated in the September 14, 1956 letter, but only until Tuuk had paid over and beyond the old annual rent of $40,500 the amounts so loaned to and already owing by Tuuk together with interest. He

testified that Andersen agreed that after those amounts had been repaid in the manner indicated, the corporation would account to Tuuk for any overage that he might pay.

Andersen denied that such an oral agreement was entered into and additionally asserts as defenses the parol evidence rule, the statute of frauds, the statute of limitations, the rule of law that payments voluntarily made cannot be recovered and Tuuk's failure to plead the so-called "audit agreement." We do not think any of the asserted defenses are applicable; the disputed factual question of whether the oral agreement was entered into was for the jury to decide.

The failure to plead the "audit agreement" issue was waived by the defendants' failure to object to Tuuk's testimony on that ground. Further, it appears that the defendants were fully aware of the nature of Tuuk's claim and, thus, were aware of the nature of the issue they were called upon to defend. The issue was joined by Andersen's testimony denying Tuuk's audit agreement claim. See GCR 1963, 118.3; *Paul* v. *University Motor Sales Co.* (1938), 283 Mich 587, 594; *Nelson* v. *Stewart* (1913), 174 Mich 127, 136.

Tuuk did not reply in writing to any of the three letters. The defendants contend that Tuuk's payment of the increased amounts provided for in the letters constituted an acceptance of their terms and they invoke the parol evidence rule and the statute of frauds to protect the writings.

A writing cannot, however, prove itself. Just as the fact that Tuuk paid the increased amounts was proved by parol, he had the right to prove by parol that his payment of those amounts, by agreement with Andersen, did not constitute an acceptance of the terms of the letters and that the

payments were made under separate oral agreements.  See 3 Corbin on Contracts, § 582, pp 448–455; 9 Wigmore on Evidence, § 2431, pp 102–104.

The defendant's argument that allowing proof of an oral agreement violates the provision of the statute of frauds which requires a lease for more than one year to be in writing (MCLA § 566.108 [Stat Ann 1953 Rev § 26.908]) elides the fact that it is the defendant landlord, not the plaintiff tenant, who relies on an unsigned writing to establish a rental different (and greater) than that stated in the 1951 lease.

In *Claerhout* v. *Tromley* (1937), 282 Mich 649, upon which the defendant landlord relies, in contrast with this case, the tenant sought to remain in possession beyond the original term of the lease under an agreement which the Court found would constitute "an unexecuted change or modification in the terms of the written lease"; here the tenancy has terminated and the question is the amount of rent payable during the period of the holdover tenancy.  *Cf. Lawson-Erb Lumber Co.* v. *Graham-Paige Co. of Michigan* (1938), 283 Mich 252, 258. In this case it is the landlord who relies on an "unexecuted change or modification." (*i.e.,* the letters) of the written lease.

The central question—a factual question—remains:  were the letters addressed by the defendant landlord to Tuuk accepted by him as the embodiment of an agreement modifying the 1951 lease to increase the rent to an amount greater than the rent fixed in the lease?

Tuuk's testimony did not seek orally to vary the terms of a contract (parol evidence rule) or to modify a contract which the law (statute of frauds) may require to be in writing.  Rather, his testimony was that he orally rejected the written offer

from the corporation contained in the first letter that he continue his tenancy at an increased rent, that such offer never became a contract and that the parties had an oral contract concerning Tuuk's payment of the increased amounts different from the proposed contract set out in the offering letter.

If, as the jury by its verdict found, the contract of the parties was oral, not written, then the written offer never became a written contract and, thus, the parol testimony did not vary or modify a written contract. The law does not require that Tuuk's alleged rejection of the written offer be in writing. It does not bar proof of an oral contract regarding the payment of indebtedness and that is what Tuuk claimed the oral contract concerned.

Tuuk had a right to prove by parol that his act of paying the amounts required under the letter did not constitute an acceptance of the letter, that the letter did not constitute an integration of an agreement of the parties and that the true contract was the oral contract concerning which he testified. See 3 Corbin on Contracts, § 577, pp 385–388. *Cf. Sams v. Feldman* (1955), 342 Mich 10; *Canvasser Custom Builders, Inc. v. Seskin* (1969), 18 Mich App 606, 611.

No part of Tuuk's claim for the refund of overpayments accrued until a date less than six years before this action was commenced on October 30, 1963. It is apparent from the jury's verdict that it believed Tuuk's testimony and, thus, that it accepted his claim of an audit agreement; under this agreement no amount would have been refundable until the entire indebtedness incurred by Tuuk for installation of the pinsetters and evidenced by the old note, together with interest, had been paid. It is not claimed that this occurred until some time in 1959, a date less than six years before the date this

action was commenced. Additionally, the trial judge charged the jury that it could not refund any amount paid more than six years before the action was commenced.

Tuuk's testimony was sufficient to frame a jury issue as to whether the monthly payments paid by Tuuk to the corporation were, as the defendants claimed, "voluntary" rent payments or, as Tuuk claimed, a combination of rent payments and payments of principal and interest of indebtednesses. The defendants' offer, reflected in the September 14, 1956 letter, to combine in one payment rent and the repayment of the old $13,472.73 indebtedness, and the inclusion of a provision for 6% interest on both that amount and the expenditures for the installation of pinsetters, made more credible Tuuk's claim that the parties had agreed that all amounts paid in excess of the old rent would constitute repayment of indebtedness and the corporation would account to Tuuk for amounts paid in excess of the old rent and the indebtedness after an audit. That may not have been the agreement of the parties, but the jury could properly conclude that it was if the jurors believed Tuuk, as they apparently chose to do.

We find no inconsistency in the jury instructions concerning Tuuk's audit agreement claim. The judge charged the jury that the rent provided in the 1951 lease would govern during the holdover tenancy unless the parties entered into another agreement and, also, that since Tuuk paid the amounts set forth in the 1956 letter, the rent stated in that letter would supersede the rent provided in the 1951 lease unless, again, the parties had another agreement regarding the amounts Tuuk paid. That was a correct statement of the law applicable in this case.

We take a different view of Tuuk's claim that there was an audit agreement in regard to the 1959

and 1961 letters. The corporation acquired land and improved it as a parking lot in 1959 at Tuuk's request. Although Tuuk claimed that it was agreed that the additional amounts paid by him to the corporation after the 1959 and 1961 letters were sent were also subject to an audit agreement, he did not, in contrast with his claim concerning the 1956 letter, state the basis upon which the audit would be made.

There is nothing in the record which would support a finding that Tuuk justifiably expected to use the parking lot and the carpeting without payment of additional rent. Tuuk's audit agreement claim regarding the increases in rent for the use of the parking lot and the carpeting is amorphous. It provides no basis upon which a judge or jury could make a determination concerning the amount which would be an appropriate rent upon an "audit"; this is not a case where the tenant claims that it was agreed that the rent he was required to pay was a reasonable amount or was to be determined by an ascertainable standard.

We do not think Tuuk should be heard to say that the increases in rent provided for in the 1959 and 1961 letters were subject to "audit" without more, without any statement regarding the basis upon which the parties had agreed the audit would be made. We have, therefore, concluded that it was error to have submitted that part of Tuuk's claim to the jury. The amount of the jury verdict will be reduced by $34,175 plus interest to be computed upon remand at the rate of 6% per annum. See 5 Am Jur 2d, Appeal and Error, § 940, pp 367–369, concerning the power of an appellate court to reduce the amount of a jury verdict where an excessive amount included therein can be segregated.

II.

*Ownership of lessee's rights in the pinsetter lease*

The automatic pinsetters were installed in 1956 pursuant to a ten-year lease (with an option for renewal) between the manufacturer and the corporation.

Tuuk claimed that he and Andersen had agreed that all the corporation's rights in the pinsetter lease belonged to Tuuk. He testified that the only reason why the pinsetter lease was entered into between the manufacturer and the corporation, and not with Tuuk, was that there would have been a great deal of red tape involved if the lease had been entered into with anyone other than the owner of the real estate.

Early in 1962, shortly before Tuuk's tenancy was terminated, the manufacturer wrote its lessees offering to sell them the pinsetter equipment they were leasing. The offer, if accepted, would terminate the lease. The manufacturer had no obligation to make this offer and had never before made such an offer.

The letter from the manufacturer to the corporation offered to sell the equipment at a discount from its "original value" of approximately $209.000. The corporation accepted the offer and purchased the equipment for $126,317.64.

Tuuk claimed that the corporation's acceptance of the manufacturer's offer to sell the pinsetter equipment and termination of the pinsetter lease constituted a conversion of his rights in that lease and his damages were $174,200. Andersen denied the agreement.

The corporation paid the manufacturer $23,000 for installation of the pinsetters; this was part of the $31,314.73 total installation cost mentioned in the September 14, 1956 letter. As previously men-

tioned, Tuuk claimed that the entire $31,314.73, *i.e.,* including the $23,000 payment to the manufacturer, constituted an advance by the corporation for Tuuk which he was obligated to repay the corporation with interest. The corporation claimed it paid that amount for its own account, but the jury verdict on the "rent" overpayment issue shows it believed Tuuk.

Although the parties to the pinsetter lease were the manufacturer and the corporation, by agreement between Tuuk and the corporation it was Tuuk who paid the rent owing to the manufacturer under the pinsetter lease—approximately $206,000 during the period 1956–1962. A representative of the manufacturer testified that the purchase price of the pinsetter equipment sold by the manufacturer to the corporation was computed on a depreciated basis and did not reflect the amounts previously paid the manufacturer as rent, that it was merely coincidental that the amount of the discount (approximately $209,000) was within a few thousand dollars of the total rent which Tuuk had paid.

Tuuk also paid all expenses in connection with the use, maintenance and ownership of the pinsetter equipment.

Although a considerable amount of money is involved in this issue, it is simply an issue of fact. This factual issue was properly submitted to the jury for resolution. That intangible personal property can be the subject of conversion, see *Warren Tool Company v. Stephenson* (1968), 11 Mich App 274, 298.

It is of no consequence that the pinsetter lease did not grant the corporation an option to purchase and, thus, at the time when Tuuk claims he entered into the alleged oral agreement concerning this lease, he could not have expected that he would thereby

obtain an opportunity to purchase the pinsetter
equipment some five years later. That opportunity,
when it came, was an adjunct of the pinsetter lease;
when the corporation availed itself of that oppor-
tunity it effected a cancellation of the pinsetter lease.
If, as the jury by its verdict found, all the lessee's
rights under the lease belonged to Tuuk, then so too
did the opportunity to purchase. *Cf. Warren Tool
Company* v. *Stephenson, supra,* p 285, footnote 6.

It is true that the pinsetter lease contained a pro-
vision prohibiting the assignment of the corpora-
tion's interest in the lease. Because of this provi-
sion the manufacturer may not have been required
to recognize the alleged agreement between Tuuk and
the corporation. However, without regard to wheth-
er Tuuk was aware of that provision of the lease,
the lease between the manufacturer and the corpora-
tion does not purport to be—clearly it is not—an
integration also of any separate oral agreement be-
tween the corporation and Tuuk. The parol evi-
dence rule does not preclude proof of the alleged
separate agreement between the corporation and
Tuuk. See *Busch* v. *Pollock* (1879), 41 Mich 64;
*Sewall* v. *Feller* (1939), 288 Mich 107; see, also, 3
Corbin on Contracts, § 582, pp 448–455.

## III.

### *Alleged conversion of Tuuk's fixtures and equipment after his tenancy terminated*

A list of personal property is attached to the 1951
lease. The lease provided that "all equipment and
supplies remaining in use or replaced because of
wear and tear" shall be left on the premises at the
termination of the lease. However, some of the
listed items were crossed out by Andersen after they
had been replaced by items newly purchased by

Tuuk. Tuuk claimed that he was not required to leave the newly purchased items on the premises. In addition, at the time of termination of his tenancy, Tuuk had on the premises personal property not listed.

Shortly after his tenancy was terminated, the defendants' attorney wrote Tuuk advising him not to remove from the premises any personal property except alcoholic beverage inventory, equipment and supplies directly related to the operation of the bar. Thereafter, on July 25, 1962, the corporation obtained an injunction prohibiting him from doing so. Subsequently, Tuuk was advised he could remove some items of personal property which the letter from the corporation's attorneys and the injunction prohibited him from removing.

The judge submitted to the jury the questions of whether the items of personal property claimed by Tuuk were his or the corporation's, whether Tuuk had sought to remove them within a reasonable time after the termination of his tenancy, whether the defendants had converted personal property belonging to Tuuk and, if so, the value of the property converted.

The defendants do not now assert that the judge erred in submitting to the jury the question of whether the items of personal property claimed by Tuuk were his or the corporation's.

We also note that although the amounts involved are large, no claim is made on this appeal that there was insufficient evidence to support the values of the personal property and fixtures (or, we note parenthetically, of the pinsetter lease) adopted by the jury or that the verdict is excessive or contrary to the great weight of the evidence.

The defendants assert, rather, that the judge erred in permitting the jury to consider the injunc-

tion as evidence of conversion and in not directing the jury to find that Tuuk failed within a reasonable time after the termination of his tenancy to remove his personal property from the premises. We find no error. It was proper to permit the jury to consider the injunction preventing Tuuk from legally removing personal property from the premises in deciding whether he justifiably failed to remove such property following the termination of his tenancy. The injunction, together with the other evidence, including Tuuk's testimony and the corroborating testimony of a former employee of the corporation concerning the corporation's use of Tuuk's personal property, precluded direction of a verdict on this issue.

In this case, in contrast with *Felcher* v. *McMillan* (1895), 103 Mich 494 (cited by the defendants), there was evidence that the defendant corporation assumed dominion over the disputed property. This justified a finding that it did more by obtaining the injunction than merely attempt to preserve the status quo until the interests of the parties in the disputed personal property could be determined.

## IV.

*Tuuk's cross-appeal: right of first refusal; loss of profits on bowling-ball business; Andersen's personal liability to pay judgment*

Tuuk relies in his cross appeal on a provision in the 1951 lease which gave him "a first refusal for the continued use of said premises on the termination of this lease, but on conditions to be negotiated between the parties hereto as of such date." We think the trial judge correctly ruled that his claim for damages for alleged breach of that provision should not be submitted to the jury. Putting aside the ques-

tion of whether the provision is sufficiently definite
to be enforced, Tuuk obtained a jury verdict on his
claim that there was an audit agreement concern-
ing the September 14, 1956 letter.  Under that letter,
as modified by the audit agreement, Tuuk was to
retain possession of the premises for an additional
five years upon payment of the installments stated
in the letter, subject to audit.

While Tuuk testified that he asked Andersen for
a new lease from time to time and was refused, he
did not claim that Andersen agreed to an extension
of the time for the negotiation of a new lease pur-
suant to Tuuk's right of first refusal.  We are satis-
fied that the September 14, 1956 letter, as modified
by the audit agreement, either constituted an agree-
ment negotiated pursuant to the right of first refusal
or represented a rejection of Tuuk's claim for a new
lease and, if the latter, constituted a breach of that
agreement which occurred more than six years be-
fore this action was commenced.

On his cross appeal, Tuuk additionally claims
damages for loss of profits of a bowling-ball business
resulting from the conversion of the equipment with
which that business was conducted on the leased
premises and from the cancellation of his franchise
by the manufacturer of the bowling balls.  The trial
judge also correctly refused to submit this claim to
the jury.  Tuuk recovered for the conversion of the
equipment used in the bowling-ball business as part
of the damages allowed for the conversion of his per-
sonal property.  Tuuk did not prove that like equip-
ment could not have been purchased with which to
conduct this business.  Nor did he prove that he
could have transferred the patronage of his custom-
ers from the location where he had conducted this
business to some new location.  Tuuk's claim for loss
of profits was not evidentially established.

The jury was instructed that it could bring in a verdict against both Andersen and the corporation for whatever damages it awarded Tuuk. The jury's verdict was for the entire amount against both defendants. On the motion for a new trial, the trial judge reduced the judgment against Andersen personally to $130,821.58. While this reduction was challenged on Tuuk's cross appeal, we see no need to address ourselves to this issue. Tuuk now concedes that the issue is academic since an appeal bond has been posted for the entire amount of the corporation's liability.

## V.

### *The contention that the defendants were prejudiced by improper cross-examination of Andersen*

The defendants assert that the trial judge erred in permitting cross-examination of Andersen on collateral matters for the purpose of testing credibility and that the trial was not fair and impartial. In substance it is claimed that there was placed before the jury facts that may have prejudiced it against the defendants. We find no merit in these claims.

No objection was raised to the initial cross-examination of Andersen regarding Tuuk's perpetual lease claim. This claim was later developed on a segregated record in the absence of the jury. Tuuk's reasonable rent claim was also developed on a segregated record. Tuuk's testimony that he was emotionally upset may be thought relevant on the question of whether he attempted to remove his personal property from the leased premises within a reasonable time after the termination of his tenancy.

Andersen was not, contrary to the defendants' assertion, cross-examined concerning the reasonableness of the rent after the trial judge decided during the course of the trial to reject Tuuk's perpetual

lease and reasonable rent claims. The questions put to Andersen after that ruling of the court appear to have been asked in an attempt to elicit from him the basis upon which he arrived at the increased rent stated in the 1956 letter; this was entirely relevant to Tuuk's audit agreement claim. Furthermore, there was little testimony by Andersen in response to these questions as most of his attorney's objections to these questions were sustained.

The jury instructions, prepared after a conference between the judge and the attorneys for the parties, were not confusing or contradictory and, read as a whole, fairly presented the issues to the jury.

In the last analysis, the central question before the jury was credibility. They were asked to decide whether the oral agreements Tuuk claimed he negotiated with Andersen had in fact been entered into. In this connection it was understandable that Tuuk's attorney would, in developing his case, go back to the commencement of the relationship of the parties. The course of dealings of the parties would bear on the likelihood of the oral agreements testified to by Tuuk having in fact been made.

In 1940 Tuuk and another person met Andersen who thereafter built the bowling alley and rented it to them. Subsequently Andersen replaced this other person and became Tuuk's equal partner. In 1947 the bowling alley was expanded from 20 to 40 alleys and the rent was increased. In 1951 the partnership between Tuuk and Andersen was dissolved; the bowling alley equipment and related equipment were distributed to Andersen and the bar and related equipment to Tuuk and the corporation and Tuuk entered into the 1951 lease. The trial judge did not err in permitting cross-examination of Andersen concerning the previous relationship of the parties

for the purpose of testing Andersen's credibility. See *People* v. *MacCullough* (1937), 281 Mich 15, 25; 58 Am Jur, Witnesses, § 625, pp 346, 347; McCormick on Evidence, § 29, pp 54–56.

After reading the transcripts we find ourselves in agreement with the following observation of the trial judge in denying the motion for a new trial:

"This was a very difficult case. It was very well tried by experienced counsel. The issues were presented for the jury's determination. Numerous cautionary instructions were given to the jury throughout the trial. At no time during this lengthy trial covering a considerable length of time did either counsel do or say anything in the presence of the jury which would improperly prejudice the jury or be a basis for a mistrial. Neither counsel at any time moved for a mistrial. It became evident that both sides were willing to seek the jury's decision on the factual issues without the slightest suggestion that the case should be retried before another jury."

In summary:

(1) Tuuk was properly allowed to prove his audit agreement claim in respect to the 1956 letter, but his claim of an audit agreement in respect to the 1959 (parking lot) and 1961 (carpeting) letters was unsubstantiated.

(2) The provision in the automatic pinsetter lease prohibiting assignment did not bar Tuuk's attempting to prove that under a separate oral agreement he had acquired all the corporation's rights under that lease.

(3) The jury was properly instructed when it was told that the injunction which prevented removal of Tuuk's personal property could be considered, together with the other evidence, in deciding whether he justifiably failed to remove his property following the termination of his tenancy.

(4) On the cross-appeal we find no error in refusing to submit for jury consideration Tuuk's claims of a right of first refusal as to the continued use of the premises and for loss of profits of a bowling-ball business.

Affirmed and remanded for modification of the judgment as provided for in the last paragraph of part I. No costs, neither party having prevailed in full.

All concurred.