**SCOTT–DOUGLAS CORPORATION, a Delaware corporation, et al., Plaintiffs,**

v.

**The GREYHOUND CORPORATION, a Delaware corporation, et al., Defendants.**

Superior Court of Delaware,
New Castle.

Feb. 23, 1973.

Courtney H. Cummings, Jr., Killoran & Van Brunt, Wilmington, for plaintiffs.

Henry R. Horsey, Morris, James, Hitchens & Williams, Wilmington, for defendants.

## OPINION

WRIGHT, Judge.

Defendants, Greyhound Corporation ("Greyhound") and Horne's Enterprises, Inc. ("Horne's"), have moved for summary judgment and dismissal as to Greyhound in this action brought by Scott-Douglas Corporation, Max Seigel, Robert K. Seigel and Bernard Feinberg for breach of a franchise contract and fraud in the inducement of the contract.

Scott-Douglas Corporation was organized under the laws of this State for the purpose of owning and operating a Horne's motor lodge near Newark, Delaware. The individual plaintiffs, Max and Robert Seigel and Bernard Feinberg were promoters of Scott-Douglas and are owners of a majority of the stock of the company. Greyhound, also a Delaware corporation, is a diversified national company which, during the period 1964–1969, owned almost all of Horne's stock. Horne's, a Florida corporation, now a subsidiary of Formco, also a Florida corporation, is and was engaged in the ownership, operation and licensing of restaurants and motor lodges.

Beginning in approximately 1963, Greyhound embarked upon an ambitious program of diversification into fields outside the bus and transportation business in which it had been engaged for 40 years. In 1964, Greyhound acquired nearly all of the stock of Horne's from the latter company's founder. For organizational purposes, Horne's was placed under Greyhound Food Management, Inc. ("Food Management"), a wholly-owned Greyhound subsidiary, together with two other food service subsidiaries, Post Houses, Inc. and Prophet Foods Co. There were common directors and officers linking Greyhound, Food Management and the three food-service subsidiaries both horizontally and vertically.

Being interested in growth during its diversification, Greyhound adopted a policy of acquiring companies it considered to have high growth potential; if the subsidiaries failed to perform up to expectations, they were sold or otherwise disposed of by Greyhound. After coming under Greyhound's control, Horne's adopted a plan to expand its territory along major segments of the Interstate Highway network through franchises. This plan it pursued until September, 1968 when Horne's suspended issuance of additional franchises and disposed of properties it considered surplus. This decision followed by several months the election of Jess Nicks as chairman of Food Management's board of directors. Nicks, upon assuming office, undertook a review of the operations and performance of the companies subordinate to Food Management in the corporate structure and concluded that Horne's was a marginal investment in terms of Greyhound's corporate policies.

Thus, when another company expressed interest in acquiring the assets of Horne's, a formal offer was requested. Negotiations toward the sale of assets continued through the summer and fall of 1968 until, in November, 1968, the Horne's board of directors adopted a resolution recommending acceptance of the offer. It was Greyhound practice to hold meetings of the parent and subsidiary companies at the same place and time, and so the resolution was speedily approved by the boards of Food Management and Greyhound Corporation in succession the same day. The sale agreement was executed in January, 1969 and settlement of the transaction took place on April 30 of that year.

Max Seigel had been in the real estate business for a number of years with his own firm and before that with a Manhattan organization. He had interests in several hotels, motels and restaurants, including franchised operations, in a number of States. Robert Seigel, Max's son, had worked for his father's firm, but had little or no experience in the operation of hotels, motels or restaurants. Bernard Feinberg, who had participated in several ventures with Max, was an attorney of 30 years' experience practicing in New Jersey. The three men became interested in acquiring a motor lodge franchise from Horne's, apparently hoping to obtain the rights to develop a chain of Horne's outlets in the Middle Atlantic region.

By April, 1965, their contacts with Horne's had progressed to the stage where Robert met with Travis Heins of Horne's to inspect the site of a projected Horne's motor lodge at Newark, Delaware where Horne's already had a restaurant in operation. Robert expressed some reservations concerning Horne's desire to erect a 100-unit motel because of the poor visibility of the site from Interstate Highway 95 and considered that a 50-unit lodge would suffice. According to Robert, Heins responded, "Well, we expect that you can anticipate 50 per cent occupancy from the Greyhound buses." The record indicates that no further mention was made of bus trade at the lodge during the inspection or at any time prior to execution of the Franchise Agreement with Horne's two months after the meeting.

In October, 1965, Robert attended a meeting sponsored by Horne's at Detroit, Michigan for existing and prospective franchises. E. T. Hughes, Executive Vice-President of Horne's, and W. E. Lassiter, Executive Vice-President of Food Management, were among those who addressed the meeting. The minutes of the meeting summarize Lassiter's remarks thus:

". . . He made clear that Greyhound did not wish to exercise unnecessary control or be otherwise restrictive with Horne's Enterprises, or Horne's Franchisees. It was Mr. Lassiter's opinion that with the Greyhound Corporation behind Horne's legally, morally, spiritually, and financially, Horne's will today become the leader in Restaurant-Motel Development."

The minutes further reflect that Hughes, summing up his remarks, "advised that it is felt that Horne's now has a realistic Development Program, and with the Franchisees, Horne's, and Greyhound Food Management, Inc. working as a team, we can accomplish our objectives. It is felt that this program will give the Horne's Franchisees the advantages of Referral Business, and the Interstate image needed to make their operations attractive and profitable ventures."

Plaintiffs further claim that Hughes told Robert in a telephone conversation in the summer of 1965 that Horne's would install a cocktail lounge in its Newark restaurant when the motor lodge opened for business. Finally, plaintiffs allege that Horne's represented that it would establish and operate a computer reservation system using Greyhound bus lines equipment. However, Robert admitted in his deposition that this alleged representation may not have occurred in 1965, but in 1968.

During 1965, while the events described above were taking place, the Seigels and Feinberg were working to obtain the required financing for the motor lodge. Having obtained commitments for financing construction of the motor lodge, plaintiffs and Horne's entered upon formal negotiations which culminated in the written agreement of July 29, 1966. The contract, termed a "Franchise Agreement", was prepared by Horne's, transmitted to plaintiffs who executed it in New Jersey, and returned it to Horne's Detroit, Michigan headquarters where it was signed by officers of Horne's on July 29, 1966.

In preparation for signing the Franchise Agreement, the individual plaintiffs caused Scott-Douglas Corporation to be organized under the General Corporation Law of Delaware on June 13, 1966. Robert was President, Max the Treasurer, Feinberg, Secretary and Carl Greenburg, the Vice-President. Robert, Max and Feinberg were and remain directors and holders of a majority of the stock of the corporation.

Plaintiffs encountered difficulties from the outset. Through no fault of plaintiffs, opening of the lodge was delayed until March, 1968. The anticipated tour and charter bus trade did not materialize; the Greyhound bus company issued a directive eliminating the Newark lodge from its stopping places; occupancy rates at the lodge were low; there was no cocktail lounge in the restaurant; there was no room service from the restaurant to the motel; referrals from other Horne's lodges did not reach expected levels; plaintiffs became dissatisfied with Horne's advertising program. Rumors began to be heard that a decision had been made to sell Horne's and Horne's issued a denial in August, 1968. September brought word that further expansion of the Horne's system was suspended. In late November, it was learned that Horne's was to be sold. Throughout its existence, the motor lodge incurred sizeable losses. Finally, in July 1969, plaintiffs abandoned the motor lodge and in March, 1970 brought this action

alleging breach of the Franchise Agreement and fraud in the inducement of the Agreement by Horne's and its parent corporation, Greyhound.

Defendants first move for dismissal of the action as to defendant Greyhound Corporation on the ground that at no time during the period here in question was the parent firm a party to the negotiations or to the contract, and dismissal of the claim by the individual plaintiffs, Max and Robert Seigel and Bernard Feinberg, on the ground that they are not the real parties in interest or summary judgment against the individual plaintiffs. I conclude that the plaintiffs have not made out a case against Greyhound and therefore the action against Greyhound should be dismissed.

■ As a general rule, the corporation is an entity distinct from its shareholders even if its stock is wholly owned by one person or corporation. Buechner v. Farbenfabriken Bayer A. G., 38 Del.Ch. 490, 154 A.2d 684 (1959). Sole ownership of stock and common directors and officers between parent and subsidiary are only some of the factors to be considered by the Court in determining whether or not the corporate fiction should be disregarded and the shareholders held liable. It requires a strong case to induce a court to consider two corporations as one on account of one owning all the capital stock of the other. Martin v. D. B. Martin Co., 10 Del.Ch. 211, 88 A. 612 (1913). Plaintiffs have failed to adduce any evidence beyond ownership and common directors and officers which in any way tends to show fraud by Greyhound Corporation.

■ The individual plaintiffs aver that they have standing to sue in their own right as promoters and investors in Scott-Douglas Corporation, the party to the Agreement, and as assignees of the corporate plaintiff. The assignment of the corporation's rights is sufficient, I conclude, to support the standing of the individual plaintiffs without addressing the question of their standing to sue as promoters and investors.

I now turn to defendant's motion for summary judgment.

■ Defendant-movant asserts that the validity of the Agreement is to be determined under the laws of the State of Michigan because the last act required for the execution of the contract took place in that State. 1 Williston on Contracts (3d ed.) § 97, pgs. 356, 360. I agree. Delaware requires the application of the law of the State where the contract was made in determining its validity, Wilmington Trust Co. v. Paul Hardeman, Inc., 172 A.2d 63 (Del.Supr.1961), unless the public policy of Delaware precludes enforcement or recognition of the agreement. Hill v. Hill, 262 A.2d 661 (Del.Ch.1970), aff'd. 269 A.2d 212 (Del.Supr.1970).

Plaintiffs, Scott-Douglas Corporation, Max and Robert Seigel and Bernard Feinberg, base their case upon two theories: Breach of the Franchise Agreement by defendant and fraud in the inducement of the contract. The measure of damages demanded under either theory is the same, the difference between what plaintiffs have realized under the Agreement as performed and what they would have realized had defendant performed in full the alleged Agreement.

Plaintiffs recognize that to prevail on their breach of contract theory, they must avoid the application of the Michigan statute of frauds and the parol evidence rule. Under the Michigan statute of frauds, Mich.G.S. § 566.132[1], agreements not in writing within the ambit of the statute are "void". However, this provision has been interpreted by the courts of that State to mean voidable at the option of the party to be bound. Bagaeff v. Prokopik, 212 Mich. 265, 180 N.W. 427 (1920). By its terms the Agreement was to last until December 31, 1985 unless terminated for cause, with renewal rights for four additional terms of 10 years each unless timely notice is given by one party to the other.

■ Where the parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing. Brady v. Central Excavators, Inc., 316 Mich. 594, 25 N.W.2d 630 (1947); 3 Corbin on Contracts § 573, pg. 357. The rule is one of substantive law and not a rule of evidence. To mitigate the harshness of the parol evidence rule, courts have recognized a number of exceptions or have held the rule inapplicable. Thus, parol evidence may be admitted to prove the making of a contract, Ensign Painting Co. v. Alfred A. Smith, Inc., 21 Mich.App. 494, 175 N.W.2d 789 (1970), Tuuk v. Anderson, 21 Mich.App. 1, 175 N.W.2d 322 (Mich. App.1969); to aid in interpreting ambiguous terms in a written contract, Taylor v. Taylor, 310 Mich. 541, 17 N.W.2d 745 (1945); to prove fraud, illegality, accident or mistake, Ensign Painting Co. v. Alfred A. Smith, Inc., *supra*, Schupp v. Davey Tree Expert Co., 235 Mich. 342, 209 N.W. 85 (1926); to prove the writing was only a partial integration of the contract, Stimac v. Wissman, 342 Mich. 20, 69 N.W.2d 151 (1955); to prove additional terms not expressed in the writing, Piasecki v. Fidelity Corp., 339 Mich. 328, 63 N.W.2d 671 (1954); and to prove a collateral or separate agreement, Danielson v. Bank of Scandinavia, 201 Wis. 392, 230 N.W. 83 (1930), Hills v. Hopp, 287 Ill. 375, 122 N. E. 510 (1919).

1. Mich.G.S. § 566.132 provides in pertinent part:

"Sec. 2. In the following cases specified in this section, every agreement, contract and promise shall be void, unless such agreement, contract or promise, or some note or memorandum thereof be in writing and signed by the party to be charged therewith, or by some person by him thereunto lawfully authorized, that is to say:

"1. Every agreement that, by its terms, is not to be performed in 1 year from the making thereof;"

■ The threshold question on admissibility of the antecedent oral agreements or understandings is whether or not the Franchise Agreement is a complete and accurate integration of the parties' contract. For this purpose, any competent evidence may be received. Stimac v. Wissman, *supra*; 3 Corbin on Contracts § 573, pp. 359–60. As to the factors to be considered by the Court in deciding whether a writing is a complete integration, the Michigan Supreme Court has said:

> "The test of the completeness of the writing proposed as a contract is the writing itself; so if it bears evidence of careful preparation, of a deliberate regard for the many questions which would naturally arise out of the subject-matter of the contract, and it is reasonable to conclude that the parties have therein expressed their final intentions in regard to matters within the scope of the writing, then it will be deemed a complete and unalterable exposition of such intentions, but if the writing shows its informality on its face, there will be no presumption that it contains all the terms of the contract." Brady v. Central Excavators, *supra*.

The prolonged exploratory contacts between the parties, the lengthy formal negotiations, the presence of counsel and the business experience and acumen of the parties leads the Court to conclude that the written Franchise Agreement was intended by the parties to be a complete and accurate memorandum of the contract as to matters within the scope of the writing. Danielson v. Bank of Scandinavia, *supra*.

Applying the above rules to the facts of the instant case, the Court holds that the Michigan statute of frauds renders void and invalid the antecedent parol agreements relating to the amount of business to be derived from Greyhound tour and charter bus trade and the establishment of a cocktail lounge in the adjacent restaurant, it being a necessary inference that these agreements were to continue during the life of the franchise Agreement. More-

over, it is questionable whether either party really considered the statements to be promises, since no evidence in the record tends to show that plaintiffs ever raised the subjects again during the period of about a year between the making of the promises and the execution of the Agreement.

■ The written Agreement, at paragraph 14, obligates Scott-Douglas Corporation to "operate this motor lodge as a part of the 'Horne's' system, particularly in the 'Horne's' advertising, promotion and referral programs, cooperate fully with other motor lodge operators in the system and diligently promote the sale of 'Horne's' service at this motor lodge and at other motor lodges in the system." In the view of the Court, this provision is sufficiently vague and indefinite to permit plaintiffs to supply evidence of parol agreements and understandings between the parties pertaining to advertising, promotion and referrals.

Plaintiffs further claim that the statement of W. E. Lassiter to the franchisee meeting in October, 1965, constituted a promise of continuing Greyhound backing for Horne's that was breached when the assets of Horne's were sold to a much smaller company in 1969. This contention is baseless. Lassiter stated that it was his "opinion" of Horne's prospects and the statement was made in light of conditions at that time. The lack of evidence in the record tending to show that plaintiffs ever explored the matter further, coupled with the provisions of the Agreement pertaining to assignment of the Agreement by defendant, reinforces the conclusion that Lassiter's statement was not intended by him nor understood by the plaintiffs to be a promise at the time it was made.

■ In bringing their action on a theory of fraud in the inducement of the contract—a tort—plaintiffs, in effect, have elected to affirm the Franchise Agreement and sue *ex contractu* to recover the difference between what they have realized under the Agreement as performed and what

they would have realized under the contract in the absence of the alleged fraud or misrepresentation of defendant. Prosser, Law of Torts (3d ed.) §§ 101, 105, pp. 708, 750–53. The tort action may be founded upon intentional fraud, negligence or breach of warranty. Id. § 100, pp. 700–01.

At the outset, it should be noted that where fraud or misrepresentation is alleged the proof of oral promises or representations made prior to execution of a written agreement is not barred by the parol evidence rule, Ensign Painting Co. v. Alfred A. Smith, Inc., *supra,* nor by the statute of frauds, Ollig v. Eagles, 347 Mich. 49, 78 N.W.2d 553 (1956); 37 C.J.S. Frauds, Statute of § 280, p. 807. Under Michigan law, "to consitute actionable fraud it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly, without any knowledge of its truth, and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. Each of these facts must be proved with reasonable certainty, and all of them must be found to exist; the absence of any one of them is fatal to a recovery." Candler v. Heigho, 208 Mich. 115, 175 N.W. 141, 143 (1919); Wettlaufer Mfg. Co. v. Detroit Bank, 324 Mich. 684, 37 N.W.2d 674, 677 (1949). The representation must relate to past or present facts. Painter v. Lebanon Land Co., 164 Mich. 260, 127 N.W. 739 (1910). Statements promissory in nature that one will do a given act in the future are contractual in nature, and the mere failure to perform does not constitute fraud, nor does it create a presumption of fraud. Danto v. Charles C. Robbins, Inc., 250 Mich. 419, 230 N.W. 188 (1930); Mieske v. Harmony Electric Co., 278 Mich. 61, 270 N.W. 216 (1936). The innocent party is not confined to proving fraud or misrepresentation at or before the time the contract was made, however, and may show evidence of subsequent acts, admissions and dealings of the defendant which tend to show the defendant's fraudulent intent at the time he made the contract. Ross v. Miner, 64 Mich. 204, 31 N.W. 185 (1887).

There is authority for the proposition advanced by plaintiffs that a party in a confidential or fiduciary relationship to another owes the other a higher duty to disclose material information. See Voellmeck v. Harding, 166 Wash. 93, 6 P.2d 373 (1931); Ultramares Corp. v. Touche, 255 N.Y. 170, 174 N.E. 441 (1931). Plaintiffs have failed to produce any evidence to support a finding that defendant owed them the duty of a fiduciary. On the contrary, the uncontroverted facts in the record indicate that the bargaining was at arm's length, that both sides were represented by legal counsel, and that plaintiffs were men of long experience in business and the law.

Assuming, *arguendo,* that the alleged statements by defendant's agents concerning tour and charter bus business and Greyhound's support for Horne's were statements of opinion only, plaintiffs may nevertheless establish actionable fraud by proof that such opinions were deliberately given falsely and with the intent to deceive. Restatement, Torts §§ 525, 530; 37 Am.Jur.2d, Fraud and Deceit § 53, pp. 81–82. Plaintiffs have failed to adduce any evidence in the record which supports their argument that the representations were affirmatively stated, Wettlaufer Mfg. Co. v. Detroit Bank, *supra,* or that they were falsely and deliberately made with intent to deceive. Ross v. Miner, *supra.* In the case of both statements, the lack of a tone of bargaining or negotiation and the informal nature of the remarks negatives a promissory intent. Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 117 N.W. 2d 213 (1962); Powell v. Beck, 366 Mich. 627, 115 N.W.2d 317 (1962).

Turning to the alleged promise by Hughes that a cocktail lounge would be installed in the restaurant when the motor lodge opened, the record is devoid of any

evidence tending to prove or disprove fraudulent intent at the time the statement was made. Since fraud is not presumed from failure to perform a promise to do an act in the future, and plaintiffs have failed to show that defendant had a present intention not to perform when the promise was made, their claim as to the cocktail lounge must fail. Danto v. Charles C. Robbins, Inc., *supra*; Ross v. Miner, *supra*. The fact that Horne's franchise information brochures depict cocktail lounges in its restaurants and that its motor lodge operations manual deals with the subject of cocktail lounges does not change the result, since materials of this type are broad in scope and designed to provide general, non-specific visualizations and guidance as to all possible activities which might be engaged in by persons operating under the franchisor's license.

■ Similarly, even if the alleged promise by Horne's to establish a computer reservation system and utilize other Greyhound controlled travel agencies to generate business for Horne's motor lodges were made prior to the making of the contract, the mere failure of Horne's to perform such promises—if promises they were— does not constitute fraud and plaintiffs have failed to carry their burden of showing defendant's fraudulent representations as to past or present facts at the time the promise was made, National Cash Register Co. v. Hosier, 251 Mich. 402, 232 N.W. 177 (1930), or subsequent acts, admissions and dealings of defendant tending to show fraud. Ross v. Miner, *supra*.

Plaintiffs further argue that they should prevail on the theory that defendant is estopped to deny the making of the alleged promises or that such promises should be enforced to avoid injustice. This raises the related issues of equitable estoppel and promissory estoppel.

■ Equitable estoppel consists of four principal elements: (1) Conduct by the party to be estopped which amounts to a false representation, concealment of material facts, or which is calculated to convey an impression different from, and inconsistent with, that which the party subsequently attempts to assert; (2) knowledge, actual or constructive, of the real facts and the other party's lack of knowledge and the means of discovering the truth; (3) the intention of expectation that the conduct shall be acted upon by, or influence, the other party and good faith reliance by the other; and (4) action or forbearance by the other party amounting to a change of status to his detriment. Denler & Denler Land Co. v. Eby, 277 Mich. 360, 269 N.W. 203 (1936); Holt v. Stofflet, 338 Mich. 115, 61 N.W.2d 28 (1953); 28 Am.Jur.2d Estoppel and Waiver § 35, p. 640. The doctrine of estoppel is founded upon the desire of courts to discourage fraud and prevent injustice, 28 Am.Jur.2d Estoppel and Waiver § 28, pp. 629–32, and fraud, actual or constructive, is the essential and central element in estoppel. Twp. of Lansing v. City of Lansing, 356 Mich. 338, 97 N.W.2d 128, 138 (1959).

■ Promissory estoppel may arise where the party to be estopped has promised to do an act in the future, although unsupported by consideration, if it was intended that the promise be relied upon and, in fact, was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetration of a fraud or would result in injustice. 28 Am.Jur.2d Estoppel and Waiver § 48, p. 656; Klass v. City of Detroit, 129 Mich. 35, 88 N.W. 204 (1901); Young v. Wallace, 327 Mich. 395, 41 N.W.2d 904 (1950). However, where a promise is made with a present intention not to perform, this is a misrepresentation of fact, giving rise to equitable, not promissory, estoppel. Danto v. Charles C. Robbins, Inc., *supra*; Kent v. Matheson, 276 Mich. 316, 267 N.W. 847 (1936). The mere failure to perform a promise will not support a finding of fraud, Kent v. Matheson, *supra*; Mieske v. Harmony Electric Co., *supra*, nor does such failure to perform raise the presumption that the promi-

sor did not intend to perform his promise at the time he made it. Kent v. Matheson, *supra*. As stated above plaintiffs have not shown that defendant did not have a present intention to perform its promises —assuming that they were promises—at the time he made them. The absence of this essential element of fraud is fatal to plaintiffs' claim of equitable estoppel. Taylor v. Ward, 264 Mich. 118, 249 N.W. 473 (1933).

■ Promissory estoppel requires: (1) The making of a promise; (2) the promisor's intent to action or forebearance; (3) reliance by the promisee; and (4) injury to the promisee. Young v. Wallace, supra; Restatement of the Law of Contracts § 90. Defendant admits that it intended to induce plaintiffs to enter into a franchise relationship with it but disputes plaintiffs' contention that such representations were promises, claiming that the statements were merely expressions of opinion or expectation. In Coulter v. Minion, 139 Mich. 200, 102 N.W. 660 (1905), it was held that where a seller of land was guilty of fraud or overreaching in overstating the value of practically worthless farm land, such opinion was a fraudulent misrepresentation of fact. Plaintiffs have produced no evidence which tends to show that defendant falsely stated its opinion or expectation or made such statements with reckless disregard of the truth upon which a jury could base a finding of fraud. Moreover, the statements of defendant's officers and agents concerning the amount of tour and charter bus business, referrals from other Horne's Lodges and Greyhound's ownership and support of Horne's were not cast in promissory form, nor have plaintiffs produced evidence that the statements were so infected by fraud as to warrant their being held promissory. Similarly, plaintiffs have

not adduced any evidence tending to show that Hughes, at the time he promised that Horne's would install a cocktail lounge in the restaurant when the motel became operational, did not intend to perform the promise. The promise to establish the cocktail lounge was made approximately one year before the parties executed the Agreement. Plaintiffs had ample time and opportunity during the preliminary discussions and formal negotiations to pin down defendant as to its intentions with respect to establishment of the cocktail lounge. Otto Baedeker & Assoc. v. Hamtramck State Bank, 257 Mich. 435, 241 N.W. 249 (1932).

■ Plaintiffs have failed to show any evidence of fraudulent intent on the part of defendant in making its representations or such fraud as would warrant enforcement of the representations as promises; fraud is not to be presumed. Moreover, plaintiffs allowed more than one year to pass, during which lengthy discussions and negotiations were held, without even seeking confirmation of the alleged promises or representations. While negligence in trusting will not excuse wilful misrepresentation, Buckley v. Buckley, 230 Mich. 504, 202 N.W. 955 (1925), only reasonably justified reliance will create an estoppel. Sheffield Car Co. v. Constantine Hydraulic Co., 171 Mich. 423, 137 N.W. 305 (1912). Whether or not plaintiffs were justified in their reliance is for the trier of fact to decide.

Plaintiffs' action against Greyhound Corporation is dismissed and defendant's motion to dismiss the Seigels and Feinberg as parties plaintiff is denied. Defendant's motion for summary judgment is denied.

Order accordingly.