KAREN RETZLER, Plaintiff-Appellant, v. PRATT AND WHITNEY COMPANY *et al.*, Defendants-Appellees.

First District (5th Division)    No. 1—98—2958

Opinion filed December 23, 1999.

Motherway, Glenn & Napleton, P.C., of Chicago (Robert J. Napleton, of counsel), for appellant.

McCullough, Campbell & Lane (Michael M. Lane and Rachel M. Krug, of counsel), and Wildman, Harrold, Allen & Dixon (Robert E. Haley and Jeanne E. Walker, of counsel), both of Chicago, for appellees.

JUSTICE QUINN delivered the opinion of the court:

Plaintiff, Karen Retzler, appeals from three orders of the circuit court disposing of her lawsuit. First, the circuit court dismissed plaintiff's second amended complaint as it related to defendant Pratt & Whitney Canada, Inc. (P&W Canada), with prejudice, because the complaint was barred by the two-year statute of limitations for personal injury actions. Second, the circuit court granted defendant United Technologies Corporation's (UTC) motion for summary judgment without recorded comment. Finally, summary judgment was granted to defendant AMR Leasing Corporation (AMR) on the grounds that a federal statute, 49 U.S.C. § 44112 (1994), impliedly preempted state claims for personal injury against lessors of aircraft. Thus, the case was disposed of in its entirety.[1]

For the following reasons, the order of the circuit court granting

---

[1] The Pratt & Whitney Company, Inc., was voluntarily dismissed from this action before the summary judgment orders were entered.

summary judgment to defendant AMR is reversed. However, the orders of the circuit court granting summary judgment to defendant UTC and granting defendant P&W Canada's motion to dismiss are affirmed.

On September 14, 1991, plaintiff was a flight attendant on American Eagle Flight 4048, an ATR 42-300 aircraft en route from Traverse City, Michigan, to Chicago, Illinois. The No. 4 bearing within the left PW120 engine failed after liftoff from Traverse City. The aircraft cabin and cockpit filled with black smoke. The pilot suddenly reduced cabin pressure and began an emergency descent and landing near Muskegon, Michigan. As a result, plaintiff's body came into violent contact with the galley of the ATR 42-300 aircraft.

Defendant P&W Canada is the manufacturer of the PW120 aircraft engine. P&W Canada is a wholly owned subsidiary of defendant UTC. Defendant AMR leased the ATR 42-300 aircraft to Simmons Airlines, Inc. (Simmons), the owner of plaintiff's employer, American Eagle.

On August 22, 1991, a month before the incident at issue, a series of financial transactions occurred with regard to the aircraft at issue. Avions De Transport Regional G.I.E. (ATR) sold the aircraft to AMR. AMR immediately sold the aircraft to Mathilde Bail G.I.E. (MB), a French company. MB then leased the aircraft back to AMR. AMR subleased the aircraft to Simmons by oral agreement. The lease was not put into writing until September 28, 1993, two weeks after the present action was filed.

On September 14, 1993, plaintiff filed a seven-count complaint against the Pratt & Whitney Company, Inc. (P&W Company), UTC, AMR, Aerospatiale, Inc., and Aerospatiale, a French corporation. On September 29, 1993, summons were served on UTC and P&W Company through Vanessa Kerrigan, an attorney and employee of Pratt & Whitney (P&W), an unincorporated division of UTC. The summons were served at the address for P&W, not P&W Company. P&W Company was a company specializing in making tools. P&W Company declared bankruptcy in 1991, was never a subsidiary of UTC, and never had offices at that address. Further, Kerrigan was not an employee of P&W Company.

In her complaint, plaintiff alleged that P&W Company was the manufacturer of the PW120 engine and was a wholly owned subsidiary of UTC. In its answer, UTC asserted as an affirmative defense that P&W Canada was the manufacturer of the engine and that P&W Company was not a subsidiary of UTC. Plaintiff replied by denying the affirmative defense. Plaintiff further alleged that AMR was the owner of the aircraft in question. The circuit court dismissed without prejudice plaintiff's initial complaint as against AMR because it failed to sufficiently allege that AMR owned the aircraft or had a duty to maintain, inspect, and test the aircraft or engine.

On July 29, 1994, plaintiff filed the first amended complaint. Aerospatiale, Inc., and Aerospatiale, a French corporation, were voluntarily dismissed from the action. In addition, plaintiff alleged that AMR had a duty to maintain, inspect, and test the aircraft and engine in question. Plaintiff claimed that this duty arose because AMR was a commercial airline engaged in the business of carrying passengers and owned or leased the aircraft at the time of the incident. Plaintiff also alleged that the duty was breached by AMR's negligence in maintaining, testing and inspecting the aircraft, which led to the emergency landing situation.

The allegations against P&W Company and UTC remained the same in the first amended complaint as they were in the original complaint. Again, UTC denied that it was the manufacturer of the PW120 engine and denied that it was the parent of P&W Company. UTC also certified for the second time that P&W Canada was the manufacturer of the engine. In addition, UTC answered plaintiff's interrogatories with the name and address of the manufacturer of the engine, P&W Canada.

On February 7, 1996, nearly 2½ years after the statute of limitations for her claim had expired, plaintiff filed a second amended complaint. In this complaint, plaintiff added P&W Canada as a defendant. Plaintiff alleged that P&W Company and P&W Canada were both wholly owned subsidiaries of UTC and were engaged in the business of designing, manufacturing, distributing and selling aircraft engines, including the PW120 engine. Plaintiff failed to distinguish between P&W Company and P&W Canada in the complaint and referred to them collectively as "Pratt & Whitney." Plaintiff claimed that P&W Company, P&W Canada, and UTC were negligent and strictly liable for the improper design, manufacture, distribution and sale of the faulty PW120 engine that necessitated the emergency landing of the ATR 42-300. The allegations against AMR were identical to the ones raised in the first amended complaint.

UTC answered the second amended complaint on May 6, 1996, admitting that P&W Canada was its wholly owned subsidiary, but denying that P&W Company was its wholly owned subsidiary. UTC also denied that it was engaged, together with P&W Canada and P&W Company, in the business of manufacturing aircraft engines, including the PW120.

On June 6, 1996, P&W Canada filed a motion to dismiss on the grounds that the claims against it were barred by the Illinois two-year statute of limitations for personal injury actions. Plaintiff countered that this was a case of misnomer under section 2—401 of the Code of Civil Procedure or, in the alternative, under section 2—616(d) of the

Code of Civil Procedure, the complaint should "relate back" to the date of the original complaint, which named P&W Company rather than P&W Canada. 735 ILCS 5/2—401, 2—616(d) (West 1996). On October 2, 1996, P&W Canada's motion to dismiss was granted with prejudice. The circuit court found that there was "not sufficient evidence for relation back under [section] 2—616(d) or that this defendant was named by misnomer under [section 2—401]." On December 20, 1996, plaintiff voluntarily dismissed P&W Company from the litigation.

On December 9, 1996, UTC filed a motion for summary judgment on the grounds that UTC (1) was not the manufacturer, designer, seller or distributer of the PW120 engine, and (2) was not responsible for the products of its subsidiary on a piercing-the-corporate-veil theory because UTC and P&W Canada are separate corporations. Plaintiff responded that UTC should be held responsible for the tortious acts of its wholly owned subsidiary, P&W Canada. Defendant UTC's motion for summary judgment was granted on May 5, 1997.

On March 13, 1998, AMR filed a motion for summary judgment on two grounds: (1) implied preemption of plaintiff's negligence claim under the Federal Aviation Act (FAA) (49 U.S.C. § 44112 (1994)); and (2) plaintiff failed to establish a duty owed to her by AMR to establish that AMR was negligent. On June 19, 1998, the circuit court concluded that AMR had established that, as a matter of law, AMR was entitled to summary judgment based on implied preemption. Although the circuit court judge based his decision on preemption, he commented that he would have been willing to sustain the motion for summary judgment on common law negligence grounds because he felt the aircraft had been adequately inspected.

Plaintiff filed a timely notice of appeal from the summary judgment and dismissal orders entered in favor of the defendants on July 15, 1998.

First, plaintiff claims that the trial court erred in granting defendant AMR's motion for summary judgment because genuine issues of material fact were present and AMR was not entitled to summary judgment as a matter of law.

In all cases involving summary judgment, we review the evidence in the record *de novo*. *Espinoza v. Elgin, Joliet & Eastern Ry. Co.*, 165 Ill. 2d 107, 113, 649 N.E.2d 1323 (1995). The court must consider the affidavits, depositions, admissions, exhibits and pleadings on file and must construe them strictly against the movant and liberally in favor of the nonmoving party. *Espinoza*, 165 Ill. 2d at 113. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party's right to judgment is clear and free from doubt.

*Espinoza*, 165 Ill. 2d at 113. Although summary judgment is encouraged to aid the expeditious disposition of a lawsuit, it is a drastic means of disposing of litigation. *Espinoza*, 165 Ill. 2d at 113. Where reasonable persons could draw divergent inferences from the undisputed material facts or where there is a dispute as to a material fact, summary judgment should be denied and the issue decided by the trier of fact. *Espinoza*, 165 Ill. 2d at 114.

In her complaint, plaintiff alleged that AMR is liable for the injuries she sustained in the emergency landing of the ATR 42-300. She alleged that AMR, as owner and/or lessor of the aircraft, had a duty not to place a defective aircraft into the stream of commerce. She claimed that AMR was negligent in failing to adequately test and inspect the engine to discover the defect, and allowing the aircraft to be flown when AMR should have known the aircraft was not in airworthy condition. As a result of AMR's failure to detect the defect in the aircraft, plaintiff alleges that the aircraft was forced into an emergency landing, in which she sustained injuries.

As far as the ruling on AMR's motion for summary judgment is concerned, the following facts are undisputed. AMR sold the aircraft in question to MB, a French company. MB leased the aircraft back to AMR, and AMR subleased the aircraft to Simmons. All of this occurred approximately one month before the incident at issue. The No. 4 bearing in the left PW120 engine of the aircraft was defective, which caused the cockpit and cabin of the aircraft to fill with smoke and forced the pilot to make an emergency landing. During the emergency landing, plaintiff sustained injuries.

Defendant AMR asserts that it is exempt from liability as a lessor under section 44112 of the Federal Aviation Act. 49 U.S.C. § 44112(b) (1994). AMR argues that the court in *Matei v. Cessna Aircraft Co.*, 35 F.3d 1142 (7th Cir. 1994), held that lessors of aircraft are exempt from both federal and state liability in personal injury actions under section 44112. AMR maintains that section 44112 preempts any state law personal injury claims against the lessor of an aircraft. The trial court agreed with AMR's position and granted AMR's motion for summary judgment based on the "implicit preemption of 49 USC [§] 44112." However, AMR's interpretation and application of *Matei* is without merit.

■ The supremacy clause of the United States Constitution provides that "the Laws of the United States *** shall be the supreme Law of the Land *** any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. In determining whether a federal statute preempts state law, this court must assess the congressional intent behind the statute. *Morales v.*

*Trans World Airlines, Inc.*, 504 U.S. 374, 383, 119 L. Ed. 2d 157, 167, 112 S. Ct. 2031, 2036 (1992). Furthermore, when interpreting a federal statute pertaining to a subject traditionally governed by state law, the court should be reluctant to find preemption. *CSX Transportation, Inc. v. Easterwood*, 507 U.S. 658, 663-64, 123 L. Ed. 2d 387, 396, 113 S. Ct. 1732, 1737 (1993). Even when a federal statute contains an express preemption provision, the starting point of our analysis is the presumption that " 'the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Weiland v. Telectronics Pacing Systems, Inc.*, 188 Ill. 2d 415, 417 (1999), quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485, 135 L. Ed. 2d 700, 715, 116 S. Ct. 2240, 2250 (1996).

■ Federal preemption of state law can occur in the following three circumstances: (1) express preemption where Congress explicitly preempts state law; (2) implied preemption where Congress has occupied the entire field (field preemption); and (3) implied preemption where there is an actual conflict between federal and state law (conflict preemption). *Gracia v. Volvo Europa Truck, N.V.*, 112 F.3d 291, 294 (7th Cir. 1997). Defendant AMR argues that section 44112 expressly preempts suits against lessors of aircraft. We disagree.

■ In *Matei*, the seventh circuit held that an aircraft owner was not liable under section 1404 of the Federal Aviation Act (now 49 U.S.C. § 44112 (1994)) for the death of the pilot. *Matei*, 35 F.3d at 1146. Section 1404 provided in pertinent part:

"[N]o lessor of any [civil] aircraft *** under a .bona fide lease of thirty days or more, shall be liable by reason of *** his interest as lessor or owner of the aircraft *** so leased, for any injury to or death of persons *** caused by such aircraft unless such aircraft *** is in the actual possession or control of such person at the time of such injury, death, damage or loss." 49 U.S.C. app. § 1404 (1988).

However, the court's holding did not stop there. The court went on to find that the owner of the aircraft was also not liable under Illinois' common law of bailment. *Matei*, 35 F.3d at 1146. The court reasoned, not that the state law claim was preempted by section 1404, but that the plaintiff simply had not established a case under Illinois common law. *Matei*, 35 F.3d at 1146. If the federal statute preempted state law claims, there would have been no need for the court to reach a decision at all on the state law claims. Thus, *Matei* implicitly rejected the idea that state claims against lessors were preempted by section 1404.

The United States Court of Appeals for the Third Circuit also found no federal preemption of state remedies in *Abdullah v. Ameri-*

*can Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999). The court in *Abdullah* stated that "[f]ederal preemption of the standards of care [in aviation] can coexist with state and territorial tort remedies." *Abdullah*, 181 F.3d at 375. The court held that even though it found federal preemption of the entire field of standards of aviation safety, "the traditional state and territorial law remedies continue to exist for violation of those standards." *Abdullah*, 181 F.3d at 375. The court continued by saying that state remedies are not automatically foreclosed by federal preemption of a particular field, but that state remedies are foreclosed where there is an irreconcilable conflict between the federal and state standards or where the imposition of a state standard in a damages action would frustrate the objectives of the federal law. *Abdullah*, 181 F.3d at 375, citing *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256, 78 L. Ed. 2d 443, 457-58, 104 S. Ct. 615, 625-26 (1984).

As evidence that Congress found state damage remedies to be compatible with federal aviation safety standards, the court looked at both the savings and insurance clauses of the FAA. First, the court pointed out that the savings clause clearly states that "[a] remedy under this part is in addition to any other remedies provided by law." 49 U.S.C. § 40120(c) (1994); *Abdullah*, 181 F.3d at 375; see also *McCord v. Dixie Aviation Corp.*, 450 F.2d 1129 (10th Cir. 1971). Second, the court emphasized that the insurance clause of the FAA requires air carriers to maintain liability insurance sufficient to pay "for bodily injury to, or death of, an individual *** resulting from the operation or maintenance of the aircraft." 49 U.S.C. § 41112(a) (1994); *Abdullah*, 181 F.3d at 375. The *Abdullah* court stated:

> "Congress could not have intended to abolish a damage remedy for injury or death if it required airlines to maintain insurance coverage to recompense injured persons. Furthermore, there is no federal remedy for personal injury or death caused by the operation or maintenance of aircraft to be found in the FAA itself. *** We must conclude therefore, that the insurance proceeds are to be available as a remedy under state or territorial law." *Abdullah*, 181 F.3d at 375-76.

Other states have also rejected the idea that state personal injury claims are preempted by section 1404 (now 49 U.S.C. § 44112 (1994)). In *Sexton v. Ryder Truck Rental, Inc.*, 413 Mich. 406, 418-19, 320 N.W.2d 843, 847 (1982), the Michigan Supreme Court rejected outright the lessor-defendant's claim that section 1404 precluded liability through preemption and ruled that Michigan state law governed the wrongful death action. Similarly, we hold that section 44112 does not preempt a personal injury action under state law against AMR, the aircraft lessors in the instant case.

■ As to the state law bailment claims, the leasing of an aircraft is subject to the general rules regarding the bailment or lease of personal property. *Ferrari v. Byerly Aviation, Inc.*, 131 Ill. App. 2d 747, 749, 268 N.E.2d 558 (1971). If the bailment is lucrative to the bailor-lessor, the bailor is liable to an injured third person if (1) he supplied the chattel in question; (2) the chattel was defective at the time it was supplied; (3) the defect could have been discovered by a reasonable inspection, when inspection is required (*i.e.*, where the danger of substantial harm because of a defect is great); and (4) the defect was the proximate cause of the injury. *Brooks v. Essex Crane Rental Corp.*, 233 Ill. App. 3d 736, 740, 599 N.E.2d 111 (1992), citing *Huckabee v. Bell & Howell, Inc.*, 47 Ill. 2d 153, 158, 265 N.E.2d 134 (1970).

Again, AMR relies on the holding in *Matei* in urging us to affirm summary judgment on common law negligence grounds. However, the plaintiff's case in *Matei* was significantly weaker than plaintiff's present case. First, the defendant in *Matei* was merely the owner of the aircraft. In the present case, defendant AMR sold the aircraft to MB and also leased the aircraft to Simmons. Second, the defendant in *Matei* presented evidence that the aircraft was in safe and airworthy condition when it was turned over to the lessee. The plaintiff in *Matei* did not produce any evidence in rebuttal and the evidence she presented on appeal was insufficient to preclude summary judgment. In the present case, plaintiff presented expert testimony that the defect would have been discovered if the engine had been properly inspected.

■ The present plaintiff has clearly established three of the four requirements for bailor-lessor liability in this case. First, it is undisputed that AMR supplied the aircraft in question. In fact, not only was AMR the lessor of the aircraft, it actually sold the aircraft to MB. Second, the aircraft was defective at the time that it was leased to Simmons. The bearing itself was contained inside the engine since the date of the engine's assembly. Third, there is no question that the defective engine led to plaintiff's injuries.

The final factor in determining whether AMR is liable under a common law bailment theory is whether the defect in the engine could have been discovered by a reasonable inspection. Such inspection may be required where the danger of substantial harm is great, as we find it is here. *Brooks*, 233 Ill. App. 3d at 740. AMR admits that it never conducted tests or performed an inspection of the engine. AMR relies on the affidavits of Simmons employees stating that the aircraft was in a safe and airworthy condition and the engines were in good working order at the time of its transfer from AMR to Simmons. Plaintiff, however, submitted expert testimony that an inspection of the engine would have revealed the defect. Looking at the evidence in the light

most favorable to the nonmoving party, here the plaintiff, we conclude that the question of whether an adequate inspection would have revealed the defect in the aircraft's engine is a genuine issue of material fact that should be resolved by a trier of fact.

Thus, the circuit court's order granting summary judgment to AMR was in error and we reverse.

■ In her brief, plaintiff also alludes to AMR's duties under a strict liability theory. However, the strict liability count in plaintiff's second amended complaint only named UTC, P&W Company, and P&W Canada. While AMR may have been subject to being sued under a strict liability theory as seller of the plane, plaintiff never successfully asserted this theory in the trial court. Plaintiff's motion to amend the complaint at issue to add a strict liability claim against AMR was denied at the trial court level. Plaintiff did not attempt to renew this motion on appeal and it is therefore waived. 134 Ill. 2d R. 341(e)(7); *Jordan v. Civil Service Comm'n*, 246 Ill. App. 3d 1047, 1049, 617 N.E.2d 142 (1993).

Plaintiff next claims that the trial court erred in granting defendant UTC's motion for summary judgment because genuine issues of material fact were present and UTC was not entitled to summary judgment as a matter of law. Specifically, plaintiff claims that there was a genuine issue of material fact as to whether UTC was responsible as a parent company for the actions of its wholly owned subsidiary, P&W Canada.

The standard of review for summary judgment orders is laid out above and will not be repeated here.

Plaintiff here has alleged both negligence and strict liability in the design, manufacture, distribution, and sale of the PW120 engine on the part of defendant UTC, as the sole shareholder of P&W Canada. It is undisputed that the actual manufacturer of the PW120 engine in question was P&W Canada, a wholly owned subsidiary corporation of UTC. In order for plaintiff to have a cause of action against UTC in either negligence or strict liability, the court would have to disregard the separate corporate status of UTC and P&W Canada. This court is unwilling to pierce the corporate veil in this matter.

■ Efforts to pierce the corporate veil are governed by the law of the state of incorporation. *Stromberg Metal Works v. Press Mechanical, Inc.*, 77 F.3d 928, 933 (7th Cir. 1996), citing *Kern v. Chicago & Eastern Illinois R.R. Co.*, 6 Ill. App. 3d 247, 250-51, 285 N.E.2d 501 (1972). In this case, defendant UTC is incorporated in Delaware, so Delaware law determines if piercing the corporate veil is appropriate. Delaware law is almost identical to Illinois law as it relates to this issue.

■ In Delaware, piercing the corporate veil is an equitable remedy and is considered only in the court of chancery, Delaware's court of equity. *Sonne v. Sacks*, 314 A.2d 194, 197 (Del. 1973). As a general rule, the corporation is an entity distinct from its shareholders, even if its stock is wholly owned by one corporation. *Scott-Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 314 (Del. Super. Ct. 1973). However, the corporate fiction may be disregarded to prevent fraud. *Buechner v. Farbenfabriken Bayer Aktiengesellschaft,*. 38 Del. Ch. 490, 493, 154 A.2d 684, 687 (1959). Sole ownership of stock and common directors and officers between parent and subsidiary are only some of the factors to be considered by the courts in determining whether or not the corporate fiction should be disregarded and the shareholders held liable. *Scott-Douglas*, 304 A.2d at 314. It requires a strong case to induce a court to consider two corporations as one on account of one owning all the capital stock of the other. *Scott-Douglas*, 304 A.2d at 314.

In the present case, plaintiff argues that the corporate veil should be pierced because P&W Canada is a wholly owned subsidiary of UTC. Plaintiff also claims that a significant portion of P&W Canada's early capitalization was provided by UTC's predecessor company, Pratt and Whitney Aircraft Company. Plaintiff contends that as the sole parent corporation, UTC has the ability to unilaterally liquidate P&W Canada at its unfettered discretion, thereby dominating and controlling P&W Canada. Further, plaintiff points out that one of the three members of P&W Canada's board of directors is also on the board of directors at UTC. Finally, plaintiff asserts that P&W Canada and UTC share common customers.

Defendant UTC relies on the sworn statements of employees of UTC and P&W Canada that UTC and P&W Canada were operated as separate and distinct corporations. The following information was gleaned from the statements of those employees. P&W Canada has been a registered Canadian corporation since 1928, whereas UTC is incorporated in the State of Delaware. UTC is a $9 billion corporation; P&W Canada has a net worth of $650 million and employs approximately 9,000 employees. The two corporations have two entirely separate boards of directors, with the exception of one member. The companies do not share any common executive officers or employees. UTC does not use the assets or property of P&W Canada, which has always been separately identified as belonging to P&W Canada. P&W Canada is adequately capitalized, has sufficient assets, and has its own insurance coverage to pay judgments against it. P&W Canada has always maintained its own engineering, testing, and customer support departments at its locations in Canada. Finally, UTC is not involved in nor does it exercise influence over, or finance, the day-to-day operation of P&W Canada.

■ We find that UTC and P&W Canada were operating as separate and distinct corporations and that the circumstances of this case are insufficient to allow plaintiff to pierce the corporate veil under Delaware law. It is not enough that UTC is the sole shareholder in P&W Canada and that they have one member of their boards of directors in common. Both corporations conformed with corporate formalities and expected treatment as such under the law. The funds of the corporations were not commingled, the places of headquarters and incorporation were completely separate, the employees were not the same, and each individual corporation was adequately capitalized. There is no evidence that UTC dominated or controlled the operations of P&W Canada, and the existence of one common board member is not sufficient to illustrate any such control.

Furthermore, there is no evidence of fraud on the part of P&W Canada or UTC that would give rise to special treatment of the two individual corporations as one entity. On the contrary, UTC revealed P&W Canada as the true manufacturer of the PW120 engine in its answer to plaintiff's first complaint. It was plaintiff's tardiness and denials that left her without recourse against the engine's manufacturer and it is for this reason that she asks to be allowed to pierce the corporate veil.

In Delaware, equity would require that P&W Canada and UTC be treated as separate and distinct entities according to their status as individual corporations. Thus, we will not allow plaintiff to pierce the corporate veil and reach UTC as the parent corporation of P&W Canada, the manufacturer of the PW120 engine. Due to the fact that these claims cannot reach defendant UTC, we affirm the circuit court's order granting summary judgment to defendant UTC as a matter of law.

Plaintiff next contends that the trial court erred in dismissing the second amended complaint, as it pertained to defendant P&W Canada, as barred by the two-year statute of limitations for personal injury claims. Plaintiff claims that her failure to name P&W Canada as a party to the original complaint was merely a misnomer, addressed by section 2—401 of the Code of Civil Procedure, and by naming P&W Canada in the second amended complaint she simply corrected that error. In the alternative, plaintiff claims that the amended complaint satisfies the requirements for relation back to the date of the original complaint as a case of mistaken identity, under section 2—616(d) of the Code of Civil Procedure. Defendant P&W Canada replies that this is not a case of misnomer, but a case of mistaken identity, and the circumstances of this case do not satisfy the requirements for relation back under section 2—616(d).

■ In reviewing an order of the circuit court finding that the

plaintiff's actions were time-barred as a matter of law, our review is *de novo*. *Weidman v. Wilkie*, 277 Ill. App. 3d 448, 456, 660 N.E.2d 157 (1995).

■ Section 2—401 provides:

"Misnomer of a party is not a ground for dismissal but the name of any party may be corrected at any time, before or after judgment, on motion, upon any terms and proof that the court requires." 735 ILCS 5/2—401(b) (West 1996).

This rule is a narrow one and will only be applied where an action is brought and summons is served upon a party intended to be made a defendant, giving notice to the real party in interest, but the process and complaint do not refer to the party by its correct name. *Webb v. Ambulance Service Corp.*, 262 Ill. App. 3d 1039, 1046, 635 N.E.2d 643 (1994); *Ashley v. Hill*, 101 Ill. App. 3d 292, 294, 427 N.E.2d 1319 (1981).

Though the plaintiff's intent is of pivotal importance, his subjective intent as to whom he intended to sue is not controlling where the record contains objective manifestations indicating an intent to sue another. *Webb*, 262 Ill. App. 3d at 1046. The most probative evidence of whom a plaintiff intended to sue is the party named by the plaintiff in the complaint. *Clinton v. Avello*, 105 Ill. App. 3d 336, 338, 434 N.E.2d 355 (1982).

■ The test in deciding whether the misnomer statute applies is whether the party sued is the real party in interest. *Barbour v. Fred Berglund & Sons, Inc.*, 208 Ill. App. 3d 644, 648, 567 N.E.2d 509 (1990). Where the misnomer statute applies, service of summons after the expiration of the statute of limitations does not bar suit as long as the plaintiff used reasonable diligence in obtaining service upon the proper defendants. *Perry v. Public Building Comm'n*, 232 Ill. App. 3d 402, 406, 597 N.E.2d 723 (1992). In the case of misnomer, the plaintiff may simply correct the mistake by amending the complaint. *Borg v. Chicago Zoological Society*, 256 Ill. App. 3d 931, 934, 628 N.E.2d 306 (1993).

■ Section 2—401, however, does not govern cases of mistaken identity where the plaintiff names and serves the wrong party. *Webb*, 262 Ill. App. 3d at 1046. Such cases are regulated under section 2—616. 735 ILCS 5/2—616 (West 1996).

Section 2—616(d) states, in relevant part:

"A cause of action against a person not originally named a defendant is not barred by lapse of time under any statute or contract prescribing or limiting the time within which an action may be brought or right asserted, if all the following terms and conditions are met: (1) the time prescribed or limited had not expired when

the original action was commenced; (2) failure to join the person as a defendant was inadvertent; (3) service of summons was in fact had upon the person, his or her agent or partner, as the nature of the defendant made appropriate, even though he or she was served in the wrong capacity or as agent of another \*\*\*; (4) the person, within the time that the action might have been brought or the right asserted against him or her, knew that the original action was pending and that it grew out of a transaction or occurrence involving or concerning him or her; and (5) it appears from the original and amended pleadings that the cause of action asserted in the amended pleading grew out of the same transaction or occurrence set up in the original pleading, even though the original pleading was defective in that it failed to allege the performance of some act or the existence of some fact or some other matter which is a necessary condition precedent to the right of recovery when the condition precedent has in fact been performed, and even though the person was not named originally as a defendant. For the purpose of preserving the cause of action under those conditions, an amendment adding the person as a defendant relates back to the date of the filing of the original pleading so amended." 735 ILCS 5/2—616(d) (West 1996).

In cases of mistaken identity, service upon the proper defendants is generally required before expiration of the time provided in the statute of limitations. *Perry*, 232 Ill. App. 3d at 406. All of the requirements of section 2—616(d) must be satisfied for the plaintiff to add a defendant after the statute of limitations period has expired, and if even one of the requisite elements is not met, the amended complaint cannot relate back. *Webb*, 262 Ill. App. 3d at 1043-44.

The court in *Webb* held that the plaintiff did not satisfy the requirements of section 2—616(d) and the complaint could not relate back. The court found that there were no inferences that would demonstrate that the plaintiff's failure to join the proper defendant was inadvertent, as required by section 2—616(d)(2). The court took into consideration that the plaintiff did not seek leave to file an amended complaint until after the named defendant filed a motion for summary judgment and that the plaintiff waited until 13 months after learning of the proper defendant's existence to seek leave to amend her complaint. In addition, the plaintiff failed to show that the proper defendant knew of the pending action and that it grew out of a transaction in which it was involved within the time that the action might have been brought, according to section 2—616(d)(4).

█ In the present case, plaintiff named UTC and P&W Company as manufacturers of the PW120 engine in the original complaint. Over two weeks later, the complaint was served on Vanessa Kerrigan, an at-

torney authorized to accept service of process for UTC and Pratt & Whitney, a division of United Technologies Corporation, in Hartford, Connecticut. In its answer to plaintiff's original complaint, UTC denied that P&W Company was its subsidiary and set forth the affirmative defense that the manufacturer of the PW120 engine was P&W Canada, not UTC. Plaintiff replied by denying the affirmative defense without further comment. In a motion to dismiss the original complaint, defendant AMR also pointed out that the manufacturer of the PW120 engine "might" have been P&W Canada.

However, seven months after receiving notice that P&W Canada was the engine manufacturer, plaintiff did not add P&W Canada as a defendant in the first amended complaint. Plaintiff continued to claim that P&W Company and UTC were in the business of manufacturing the PW120 airplane engine together. AMR again pointed out in its motion to dismiss the first amended complaint that P&W Canada appeared to be the manufacturer of the PW120 engine. UTC also answered the amended complaint by again denying that P&W Company was its subsidiary and setting forth the affirmative defense that the manufacturer of the PW120 engine was P&W Canada. In addition, UTC filed the answers to plaintiff's interrogatories, which stated three times that P&W Canada was the manufacturer of the PW120 engine and twice gave P&W Canada's address. Plaintiff again replied to UTC by simply denying the affirmative defense without further comment.

P&W Canada was not joined as a party to this action until plaintiff filed the second amended complaint, over two years after plaintiff learned of P&W Canada's existence. Furthermore, P&W Company was not voluntarily dismissed from the action until over two months after P&W Canada's motion to dismiss had been granted.

Section 2—401 cannot be applied to the case at hand because the party served was not the real party in interest. Summons were not served on the proper defendant, P&W Canada, but on P&W Company and UTC. P&W Company, P&W Canada, and UTC are separate and distinct corporations. Although UTC is the parent corporation of P&W Canada, plaintiff did not show that P&W Canada had notice of this action, through UTC or otherwise, until it was served under the second amended complaint. The agent that accepted service of the original complaint was not an agent that was authorized to receive service on behalf of P&W Canada, she was only authorized to accept service for UTC and Pratt & Whitney, a division of United Technologies Corporation. Thus, P&W Canada did not have actual notice of the proceedings and the misnomer statute cannot be applied here.

Since the statute of limitations for this action expired before P&W

Canada was added as a defendant and section 2—401 does not apply, plaintiff must meet all of the requirements of section 2—616(d) to relate back the second amended complaint to the date of the original complaint. Plaintiff did not satisfy sections 2—616(d)(2) and (d)(4), and the complaint cannot relate back.

Section 2—616(d)(2) requires that the failure to join a defendant be inadvertent. 735 ILCS 5/2—616(d)(2) (West 1996). There are no inferences to be drawn that plaintiff inadvertently failed to join P&W Canada as a defendant. As stated above, the record shows that plaintiff waited for over two years after learning of P&W Canada's existence to join it as a defendant.

Plaintiff also failed to comply with section 2—616(d)(4). Plaintiff failed to illustrate that P&W Canada knew of the pending action and that it grew out of a transaction in which it was involved within the time that the action might have been brought. There is no evidence that P&W Canada had notice of the action, especially without receiving the late summons that were served on the other defendants.

We find that plaintiff's joinder of P&W Canada is not permissible under section 2—401 and does not meet the requirements for relation back under section 2—616.

Based on the foregoing, we reverse the trial court's order granting summary judgment to defendant AMR, and the cause is remanded for further proceedings on that issue. However, the trial court's orders granting summary judgment to defendant UTC and dismissing the complaint as to defendant P&W Canada are affirmed.

Affirmed in part and reversed in part; cause remanded.

HARTMAN and GREIMAN, JJ., concur.