**In re TELIGENT, INC., Reorganized Debtor.**

**Savage & Associates, P.C., as Unsecured Claims Estate Representative of Teligent, Inc., Plaintiff,**

v.

**Alex Mandl, Defendant.**

**Bankruptcy No. 01–12974(SMB).**
**Adversary No. 03–2523.**

United States Bankruptcy Court, S.D. New York.

April 7, 2005.

Denise L. Savage, Michael K. Gertzer, of Counsel, Savage & Associates, P.C., White Plains, NY, for Plaintiff.

Robert N. Michaelson, Judith Sturtz Karp, of Counsel, Kirkpatrick & Lockhart LLP, New York, NY, for Defendant.

## MEMORANDUM DECISION AND ORDER REGARDING MOTION AND CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT

STUART M. BERNSTEIN, Chief Judge.

The defendant Alex Mandl, is the former Chairman and Chief Executive Officer of

the debtor Teligent, Inc. When he left his employment approximately three weeks before the petition date, Teligent forgave an outstanding $12 million loan. The plaintiff, the Unsecured Claims Estate Representative, brought this adversary proceeding primarily to avoid the loan forgiveness as a fraudulent transfer, and recover its value.

Mandl has moved for partial summary judgment contending that no transfer occurred within the meaning of the Bankruptcy Code. The plaintiff has cross-moved for partial summary judgment, arguing that the loan forgiveness resulted in a transfer. For the reasons that follow, Mandl's motion is denied, and the plaintiff's cross-motion is granted, except as otherwise set forth below.

## BACKGROUND

### A. Mandl's Hiring and the $15 Million Loan

Prior to joining Teligent in 1996, Mandl was the "number two" person at A T & T. (*Deposition of Alex Mandl*, held Mar. 5, 2004 ("*Mandl Deposition*"), at 27–28.) [1] On or about August 19, 1996, he entered into an employment agreement with Teligent (f/k/a Associated Communications, L.L.C.) (the "Employment Agreement"), effective September 1, 1996, to serve as its Chairman of the Board and Chief Executive Officer. (*Affidavit of Alex Mandl in Support of Defendants' Motion for Partial Summary Judgment*, sworn to Dec. 6, 2004 (the "*Mandl Affidavit*"), Ex. 1)(*See* ECF Doc. # 41.) The Employment Agreement granted Mandl "such authorities, duties and responsibilities customarily assigned" to those positions in like compa-

nies, and prohibited Teligent from assigning Mandl any duties or responsibilities that were "materially inconsistent with, or that materially impair his ability to discharge, the foregoing duties and responsibilities." (Employment Agreement, at ¶ 3.) The initial term of the Employment Agreement ran for six years. The agreement was extended automatically thereafter for one year periods unless either party elected not to extend. (Employment Agreement, at ¶ 2.)

As part of the deal, the original shareholders of Teligent, Microwave Services, Inc. and Digital Services Corporation, loaned Mandl an aggregate of $15 million, and Mandl signed two promissory notes (the "Notes") evidencing the debt. (*See* Employment Agreement, at ¶ 4(f); *Mandl Affidavit*, Ex. 2.) The Employment Agreement, as amended by a November 4, 1998 agreement which, *inter alia*, assigned the Notes to Teligent, (*see Mandl Affidavit*, Ex. 3), provided that 20% of the principal and all of the outstanding interest would be forgiven on the first anniversary date provided that Mandl remained employed by Teligent. If Mandl was still employed on the fifth anniversary of the Employment Agreement, the balance of the loan would "automatically be forgiven." (Employment Agreement, at ¶ 4(f).) Because Mandl left Teligent prior to the fifth anniversary, his loan was not automatically forgiven under this provision.

The loan would also "automatically be forgiven" in three situations even if Mandl was no longer employed by Teligent on the fifth anniversary. These included a termination by Teligent "other than for Cause," (*id.*), a termination by Mandl for "Good Reason," (*id.*), or a "Change of Control."

---

1. The transcript of Mandl's deposition is attached as Ex. E to the *Unsecured Claims Estate Representative's Objection to Alex Mandl's Motion for Partial Summary Judgment and the* *Representative's Cross–Motion for Partial Summary Judgment*, dated January 10, 2005 (ECF Doc. # 46).

(*Id.*, at ¶ 8(a).) "Good Reason" included Teligent's failure to comply with any material provision of the Employment Agreement, including a breach of the provision committing Teligent to employ Mandl as its chairman and CEO with the customary duties and responsibilities. (*Id.*, ¶¶ 6(d)(I), 3.) Prior to termination for "Good Reason," however, Mandl had to give Teligent written notice and allow Teligent twenty days to cure the breach. (*Id.*, at ¶ 6(d)(I).) A "Change in Control" occurred if a third party (*i.e.*, someone other than the original shareholders, their affiliates or Mandl) acquired more than 50% of the voting interests or the majority of the Teligent board consisted of a third party's designees. (*Id.*, ¶ 8(b).)

The loan was a bonus designed to induce Mandl to leave A T & T, and was structured as a loan to defer the taxes. (*Mandl Deposition*, at 27–29.) It also served as a "retention mechanism," since Mandl was obligated to repay the loan if he was fired for cause or resigned without "Good Reason" during the first five years. (*See id.*, at 29–30.) If, on the other hand, an "automatic forgiveness" occurred, Mandl became entitled to a $5 million payment.[2] (*See* Employment Agreement, at ¶¶ 4(e)(I), 4(e)(iv), 8(a).) The payment was designed to give Mandl cash to meet the tax obligation triggered by the automatic forgiveness of the loan. (*Mandl Deposition*, at 68–69.)

## B. Mandl's Departure From Teligent

Mandl assumed his duties with Teligent on or about September 1, 1996. In April 2001, IDT Corporation acquired a significant equity stake in Teligent.[3] The new ownership wanted to bring in its own management team, (*id.*, at 42), and the chief executive officer of IDT "expressed his interest" that Mandl should leave. (*Id.*, at 43.) They did not discuss the procedure for his departure. (*Id.*, at 44–45.) Mandl initially thought he had tendered his resignation which the board voted to accept. (*Id.*, at 45–47.) He subsequently stated on cross-examination that he was not sure he ever actually signed or tendered a letter of resignation. (*Id.*, at 69–71.) Neither side has produced a resignation letter, or copies of board minutes showing that Mandl tendered his resignation to the board, or that the board acted on it.

Mandl's actual termination was effected through a "Separation and Settlement Agreement," dated as of April 27, 2001 (the "Separation Agreement"). (*See Mandl Affidavit*, Ex. 4.) It contained the following significant provisions:

1. Mandl's employment as Chief Executive Officer was terminated by Teligent, "other than for cause," effective April 27, 2001. He also resigned as Chairman of the Board and from every committee of which he might be a member. (*Id.*, ¶ 1.)

2. The parties restructured the automatic forgiveness of the loan that now stood at $12 million. Under ¶ 7 of the Separation Agreement, Teligent agreed to forgive the loan automatically in twenty annual installments rather than all at once. The change reflected the parties' understanding that Teligent was not going to pay the $5 million due under the Employment Agreement, and they agreed to spread out the loan for-

---

2. In the event of a "Change in Control," Teligent was entitled to a credit for any prior payments made under ¶ 4(e). (Employment Agreement, ¶ 8(a).)

3. IDT's acquisition is discussed in some detail in the *Affidavit of James V. Continenza, Chief Operating Officer of Teligent Inc. in Support of First Day Motions*, sworn to May 21, 2001, at ¶ 25–28 (Case No. 01–12974, ECF Doc. # 3).

giveness to mitigate or defer Mandl's tax liability. (*Mandl Deposition*, at 68–69.)

3. Finally, the Separation Agreement included mutual releases and covenants not to sue. (*See* Separation Agreement, ¶ 3.)

## C. Teligent's Bankruptcy and This Adversary Proceeding

Teligent and over twenty affiliates filed their chapter 11 cases on May 21, 2001, less than one month after Mandl's termination. Teligent confirmed a plan (the "Plan"), which provided for substantive consolidation of all of the debtors, on September 6, 2002. The Plan established the Unsecured Claims Estate Representative (the "Representative"), the plaintiff in this adversary proceeding, and vested the Representative with the authority to bring claims arising under chapter 5 of the Bankruptcy Code, *i.e.*, avoidance claims, for the benefit of the unsecured creditors. All other rights, including the right to pursue common law claims such as for breach of contract, vested in Reorganized Teligent.[4]

The plaintiff commenced this adversary proceeding on April 25, 2003, and thereafter filed her second amended complaint, dated March 14, 2004 (the "Complaint"), through which she seeks to recover $15,040,105.40. All but $40,105.40 sought by the plaintiff relates to the original $15 million loan and its forgiveness. The remainder concerns payments made within ninety days of the petition date, and defined in the Complaint as the "Prepetition Transfer." (Complaint, at ¶ 9.)

The Complaint includes six claims for relief. The First Claim seeks to recover the Prepetition Transfer as a preference under 11 U.S.C. § 547. The Second and Third Claims seek to avoid the "Loan Transfers," a term that encompasses both the original $15 million loan and the subsequent loan forgiveness. (Complaint, at ¶ 11.) The gravamen of the claims is that the Loan Transfers were constructively fraudulent. The Fourth Claim seeks to recover the Loan Transfers made on or after the petition date as unauthorized post-petition transfers. The Fifth Claim alleges that the all of the Transfers were property of the estate, and should be preserved for the benefit of the estate. Finally, the Sixth Claim seeks a turnover of the transfers, apparently under 11 U.S.C. § 542, because the transfers are property of the estate.

Mandl moved for partial summary judgment to dismiss the Second through Sixth Claims. He maintains that the loan was funded by Teligent's original shareholders, and did not involve a transfer of Teligent's property. Furthermore, the loan forgiveness was not a transfer within the meaning of the Bankruptcy Code. He contends, in this regard, that neither the termination of Teligent's right to enforce the Notes nor the restructuring of the forgiveness diminished the estate or harmed the creditors.

The plaintiff opposed Mandl's motion and cross-moved for summary judgment. She maintains that Mandl waived the defense that the loan obligation had terminated because he never raised it in the answer. In addition, she argues that the discharge or forgiveness of the loan is avoidable as a fraudulent transfer.

## DISCUSSION

### A. Standards Governing Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adver-

---

4. The provisions of the Plan, and the Representative's powers and duties, are discussed in more detail in *In re Teligent, Inc.*, 306 B.R. 752, 755–56 (Bankr.S.D.N.Y.2004).

sary proceeding by Fed. R. Bankr.P. 7056, governs summary judgment motions. A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The moving party bears the initial burden of showing that the undisputed facts entitle him to judgment as a matter of law. *Rodriguez v. City of New York*, 72 F.3d 1051, 1060–61 (2d Cir.1995). If the movant carries this initial burden, the nonmoving party must set forth specific facts that show triable issues, and cannot rely on pleadings containing mere allegations or denials. Fed.R.Civ.P. 56(e). *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In deciding whether material factual issues exist, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. at 587, 106 S.Ct. 1348.

## B. Did a "Transfer" Occur?

■ The party asserting a constructive fraudulent transfer must prove three elements: (1) a transfer of the debtor's property, (2) while the debtor was insolvent or which rendered the debtor insolvent [5] (3) for less than reasonably equivalent value (under bankruptcy law and the Uniform Fraudulent Transfer Act) or fair consideration (under the Uniform Fraudulent Conveyance Act). *See Pereira v. Dow Chemical Co. (In re Trace Int'l Holdings,*

*Inc.),* 301 B.R. 801, 805 (Bankr.S.D.N.Y. 2003). According to the parties, the principal question is whether the loan forgiveness was a "transfer" within the meaning of the Bankruptcy Code. Section 101(54) of the Bankruptcy Code defines "transfer" as

[E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.

■ Generally speaking, the broad definition of "transfer" is sufficiently robust to cover the release of an obligation to pay money. The right to collect a debt is "property or ... an interest in property," and the release disposes of or parts with it. *Metzger v. Farris (In re e2 Communications, Inc.),* 320 B.R. 849, 856 (Bankr. N.D.Tex.2004); *cf. Besing v. Hawthorne (In re Besing )*, 981 F.2d 1488, 1494 (5th Cir.1993)(state court dismissal of cause of action was "transfer" under Bankruptcy Code). Mandl has not disputed this general proposition.

Mandl nevertheless points to several cases supporting the proposition that the pre-petition termination of a contract right pursuant to the terms of a contract is not a "transfer" under the Bankruptcy Code. *Sullivan v. Willcock (In re Wey )*, 854 F.2d 196, 199–200 (7th Cir.1988); *In re 421 Willow Corp.,* No. MISC. 03–182, 2003 WL 22318022, at \*4 (E.D.Pa. Oct.9, 2003); *Coast Cities Truck Sales, Inc. v. Navistar Int'l Transp. Co. (In re Coast Cities Truck Sales, Inc.),* 147 B.R. 674, 677–78 (D.N.J. 1992); *Edwards v. Fed. Home Loan Mortgage Corp. (In re LiTenda Mortgage Corp.),* 246 B.R. 185, 191 (Bankr.D.N.J. 2000). According to Mandl, Teligent ter-

---

**5.** The fraudulent transfer laws include other financial tests, but the Complaint only alleges insolvency. (Complaint, ¶ 21.)

minated Mandl "other than for Cause," resulting in the automatic forgiveness of the loan under the terms of the Employment Agreement.

The cases cited by Mandl are distinguishable in at least one important respect. In each instance, the debtor committed a pre-petition breach that terminated, or permitted the other party to terminate unilaterally, the debtor's rights under the breached contract. Thus, in *Wey*, the debtor forfeited his deposit when he defaulted under the terms of a contract to purchase real estate. In *421 Willow*, the landlord terminated a lease in accordance with its terms after the debtor-tenant assigned the lease without the landlord's consent. In *Coast Cities Truck Sales*, the non-debtor exercised its contractual right to terminate based upon the debtor's failure to pay its obligations under the parties' truck dealership agreement. In *Li-Tenda Mortgage*, Freddie Mac terminated its mortgage servicing agreement with the debtor, pursuant to its terms, based upon the debtor's breach.

In contrast, Teligent and Mandl mutually agreed to terminate the Employment Agreement; it did not terminate or expire by its own terms. Furthermore, the parties agreed to release Mandl from his liability for the loan, both by stipulating that the termination was "other than for Cause" and by providing for an outright release. Many contracts permit the parties to alter or modify their agreement through a later, signed writing, and the Employment Agreement included this common provision. (*See* Employment Agreement, at ¶ 18.) As a result, parties can generally terminate their obligations and release each other under the terms of their original agreement. If such a release is not a transfer, it would be the rare release that would be.

 Consequently, the mutual agreement to release Mandl from the repayment of his loan obligation pursuant to the Separation Agreement was a "transfer."[6] This conclusion does not, however, resolve the parties' dispute or the issue of value discussed in the next section.

## C. Did the Transfer Deprive Teligent of Any Value?

 The significant question, which the parties will have to focus on in future proceedings, is whether the transfer of the right to collect the loan deprived Teligent of anything of value. Fraudulent transfer law permits the recovery of transfers that unfairly diminish a debtor's estate. 1 GARRARD GLENN, FRAUDULENT CONVEYANCES AND

---

**6.** This conclusion moots the dispute over the applicability of the parol evidence rule. The parol evidence rule is a rule of substantive law. *Scott–Douglas Corp. v. Greyhound Corp.*, 304 A.2d 309, 315 (Del.Sup.Ct.1973). Where the parties have reduced their agreement to a complete, written integration, the parol evidence rule bars evidence of prior agreements or understandings for the purpose of varying or contradicting the terms of the writing. *Id.* Several exceptions exist. Parol evidence is admissible, among other reasons, to aid in the interpretation of ambiguous terms, to prove fraud, illegality, accident or mistake, to show that the parties agreed to additional terms and to prove a collateral or separate agreement. *Id.*

None of the exceptions apply, and Mandl correctly argues that the parol evidence rule bars the plaintiff from showing that his termination was not "other than for Cause." The Separation Agreement is unambiguous, and the plaintiff has failed to offer any evidence of fraud, illegality or mistake. Mandl, although technically the Chairman and CEO until he resigned, had been ousted by IDT which had assumed operational control. Thus, there is no basis to infer that he used his former position to exact an unfair advantage. On the other hand, the parol evidence rule does not affect the conclusion that the Separation Agreement effected a transfer, or bar inquiry into the value of what Teligent surrendered or received in return.

PREFERENCES § 275, at 471 (rev. ed.1940); see *Buchwald v. Di Lido Beach Resort, Ltd. (In re McCann, Inc.)*, 318 B.R. 276, 282–83 (Bankr.S.D.N.Y.2004). In addition, the value of what was transferred provides one side of the equation for deciding the reasonable equivalence or fairness of the exchange. Lastly, the plaintiff's recovery is limited to the value of the transfer. *See* 11 U.S.C. § 550(a).[7]

In 1996, Teligent acquired a contingent right to collect the loan evidenced by the Notes. The right terminated under the Employment Agreement if (1) Teligent terminated Mandl "other than for Cause," (2) Mandl terminated for "Good Reason," or (3) a "Change of Control" occurred. If the right to collect terminated prior to the release of that right, the property interest would have been without value at the time it was transferred. In that circumstance, the transfer would not deprive the estate of anything of value, or harm the creditors, Teligent would have received reasonably equivalent value or fair consideration for the "transfer," even if it received nothing, and the plaintiff's recovery under § 550 would be limited to zero.[8]

The evidence provided thus far raises significant disputed questions of fact regarding Teligent's right to collect the loan prior to the Separation Agreement. First, Mandl had "Good Reason" to quit. IDT had purchased control and stripped him of his title and responsibilities. It is true that he did not resign from Teligent for "Good Reason," or provide Teligent with an opportunity to cure. Nevertheless, the Separation Agreement may represent the parties' agreed resolution of Mandl's status, sparing him the need to go through the seemingly futile exercise of sending a cure notice to IDT. I note, in this regard, that a termination "other than for Cause" was the functional and economic equivalent of a termination for "Good Reason." Second, Mandl's obligation to pay may have terminated automatically, without any action on his part, under the "Change in Control" provisions.

Accordingly, Mandl's motion for summary judgment is denied, and the cross-motion is granted but only to the extent of deciding that the provisions of the Separation Agreement resulted in a transfer of Teligent's right to collect Mandl's debt. Further proceedings are necessary to fix the value of the right at issue at the time of the Separation Agreement, and in the event that the right had value, to determine whether Teligent received fair consideration or reasonably equivalent value.

The Court has considered the parties' other arguments, and concludes that they lack merit. The parties are directed to contact chambers to schedule further proceedings.

So ordered.

---

7. The plaintiff cannot avoid the release and prosecute a contract claim to recover on the Notes. The latter claim vested in Reorganized Teligent, and the plaintiff's remedies are limited to those available under 11 U.S.C. § 550. *See Savage & Assocs., P.C. v. BLR Servs., SAS (In re Teligent, Inc.)*, 307 B.R. 744, 749 (Bankr.S.D.N.Y.2004).

8. For this reason, Mandl's failure to plead the termination of the right to collect does not prevent him from asserting it now. The termination is relevant to the value of what Teligent transferred and what it received in return. The plaintiff must address these questions as part of her affirmative case.